### CITY OF WINONA v. WISCONSIN–MINNESOTA LIGHT & POWER CO.

(District Court, D. Minnesato, First Division. March 5, 1921.)

**1. Gas ⬤=14(1)—Cost of reproduction not sole basis of value.**

The valuation of a gas plant on which the rates are to be based is the reasonable value of the property employed at the time it is being used for the public, and the cost of reproduction at the time of the use, less depreciation, is not necessarily that value, but such cost is only one of several factors to be considered in determining the value.

**2. Gas ⬤=14(1)—Valuation must be based on reasonable judgment under all circumstances.**

There can be no mathematical certainty in fixing the valuation of a gas plant on which the owner is entitled to a fair return, nor can any formula be used in all cases; but the question is to be determined by a reasonable judgment based on proper consideration of all relevant facts.

**3. Gas ⬤=14(1)—Valuation by master based on cost of reproduction held excessive.**

The valuation placed by the master on a gas plant, which was based on the cost of reproduction of the plant, less depreciation, *held* excessive under the evidence, especially in view of the tendency toward lower cost prices manifest since the master considered the case and which was still continuing.

**4. Gas ⬤=14(1)—Normal price not basis for valuation.**

In ascertaining the value of a gas plant on which the company is entitled to a fair return, the cost of reproduction is not to be figured on a normal price for materials and labor, since experience shows there is no such thing as a normal price to which the costs of material and labor tend to return after each departure.

**5. Gas ⬤=14(1)—Depreciation should be determined by inspection, not by theory.**

The depreciation of a gas plant which is to be deducted from its cost in determining the present value should be the actual depreciation as determined by an inspection of the plant to ascertain its present efficiency, and not any theoretical depreciation.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. **Gas ⟐⟐14(1)—Cost of financing not element of value without evidence of expenditure.**

In determining the cost of reproduction of a gas plant to aid in fixing a reasonable rate, where there was no evidence of any expenditure in financing the original construction of the plant, no item for cost of financing should be included in the cost of reproduction, though such item would be proper if the evidence showed such cost had been originally incurred.

7. **Gas ⟐⟐14(1)—Overhead items included in the cost of reproduction without evidence of expenditure.**

In estimating the cost of reproduction of a gas plant, overhead items which were of such a nature that it was practically certain they were actually incurred in the original construction of the plant may be allowed, though there was no evidence they were incurred.

8. **Gas ⟐⟐14(1)—Cost of rate litigation not considered in determining rate.**

The cost of the litigation by which the rate a gas company is entitled to charge is fixed should not be considered in determining the rate.

9. **Gas ⟐⟐14(1)—Quarterly adjustment of rate based on net holder cost approved.**

In the report of a master fixing the rate which a gas company is entitled to charge, a provision that the rate thereby fixed should be adjusted quarterly on the basis of the variation in the net holder cost is proper.

10. **Gas ⟐⟐14(1)—Provision for revaluation every five years proper.**

A decree fixing the price a gas company is entitled to charge for its gas, with a provision for a revaluation of the gas plant every five years, is practicable and fair.

In Equity. Suit by the City of Winona against the Wisconsin-Minnesota Light & Power Company. On exceptions to the master's report. Exceptions sustained in part and overruled in part, and decree directed, fixing the rate which defendant might charge for gas.

R. A. Randall, of Winona, Minn., and O'Brien, Young, Stone & Horn, of St. Paul, Minn., for plaintiff.

Butler, Mitchell & Doherty, of St. Paul, Minn., for defendant.

BOOTH, District Judge. This cause came on for hearing upon exceptions to the report of the special master heretofore appointed in the cause to take and report to the court the evidence in the case, to examine the evidence, make the necessary computations, find and state the facts, and make a report to the court of the facts as found and of the results of such computations, and to recommend to the court in the report a form of proper decree.

The exceptions are voluminous and cover practically the whole range of the master's findings. It will not, however, be necessary to take them up and discuss them in detail. Among the master's findings the following appear:

"That the ordinance, a copy of which is Exhibit E, attached to the complaint, entitled 'An ordinance to amend an ordinance entitled "An ordinance relative to lighting the city with gas," ' passed August 1, 1870, and the ordinances amendatory thereof, are violative of the Fourteenth Amendment to the Constitution of the United States, and are therefore void and of no effect; and I would further find that the price and rate for gas as fixed

in said ordinances, i. e., $1.45 per thousand cubic feet, is unreasonable, confiscatory, and void."

"The ordinance, a copy of which is Exhibit F attached to the complaint, entitled 'An ordinance establishing maximum charges to be made for gas in Winona,' passed January 24, 1920, was passed without authority; that the same is in violation of the Fourteenth Amendment to the Constitution of the United States and is therefore null and void; and that the rate therein prescribed, namely, $1.45 per thousand cubic feet for gas, is unreasonable, confiscatory, and void."

These findings are approved.

In reference to operating expenses of the company, valuation of its property, and the rate of return:

The master found that a proper allowance for operating expenses of the company for the ensuing year was $105,-373.97, which would be equivalent to ................ $1.463 per thousand cubic feet of gas sold;

That the excess leakage in the system amounted to ............ .046   Per M cu. ft.

per thousand cubic feet, which deducted as a penalty from the operating expenses left .................................. $1.417 as net operating cost.

The master found that an amount should be set aside for depreciation reserve equivalent to .................................. .13 of gas sold.

He further found that the rate of return which would be reasonable was 8 per cent., and he found that the valuation upon which the return should be computed was $577,043, equivalent to ......... .60 of gas sold.

Total rate recommended as reasonable.................. $2.15.

As to the operating expense: After examination of the evidence I am of opinion that the master's findings are in the main sustained, and with minor corrections made as suggested by counsel, the operating expenses are allowed at $1.41 per M cubic feet of gas sold.

The method adopted by the master of handling the city contract for gas appears to be justified, and is approved.

As to depreciation reserve: The rate allowed by the master was 2½ per cent. on the value of physical property depreciated, less the value of land and of benches. This in figures was 2½ per cent. on $386,225, making $9,655, equivalent to 13 cents per thousand cu. ft. of gas sold.

After examination of the evidence I am of opinion that the rate of allowance for depreciation reserve was justified by the evidence, and was fair and reasonable. But inasmuch as the valuation made by the master should in my judgment be revised, the resultant figures as to depreciation reserve will be changed, and will be given later on. As pointed out by the master, this general depreciation reserve is exclusive of a special depreciation reserve for relining benches, which latter is included in operating expenses.

As to the rate of return: The evidence in my opinion justifies fully the rate, adopted by the master, of 8 per cent.

As to valuation of the property: The master adopted the method of cost of reproduction new less depreciation. Four estimates were submitted for consideration, as appears from the evidence:

| Classification. | No. 1.<br>City's Estimate<br>Normal<br>Pre-War Construction<br>Cost. | No. 2.<br>Company's Estimate<br>Reproduction New<br>Cost, 5-Year Average<br>Price Basis Ending<br>May 1, 1919. | No. 3.<br>Company's Estimate<br>Reproduction New<br>Cost, Current Price<br>Basis For<br>May 1, 1919. | No. 4.<br>Company's Estimate<br>Reproduction New<br>Cost, Current Price<br>Basis For<br>March 1, 1920. |
|---|---|---|---|---|
| Land | $ 8,960 | $ 8,960 | $ 8,960 | $ 8,960 |
| Transmission and distribution | 149,454 | 216,415 | 294,095 | 323,504 |
| Buildings and miscellaneous structures | 17,268 | 24,822 | 32,668 | 35,935 |
| Plant equipment | 73,795 | 101,538 | 135,440 | 163,728 |
| General equipment | 3,964 | 6,385 | 8,146 | 8,961 |
| Paving (actually disturbed) | 878 | 1,463 | 1,742 | 1,916 |
| Total physical property not including overhead charges. | 245,319 | 359,383 | 482,051 | 543,004 |

NOTE.—The estimates above set forth include contractor's profit, but do not include any sum or amount to cover "overheads"; i. e., legal organization, or general expense, engineering or superintendence, interest during construction, taxes during construction, omissions or contingencies, nor any allowance for working capital, cost of financing, or going value. The company claims and will offer proof to show that proper allowances should be made, and that appropriate sums or amounts should be included to cover each and all of these items.
The land values in all cases were taken on the basis of current values.

The master also adopted the estimate No. 3, representing cost of reproduction new of the physical properties at prices prevailing May 1, 1919. He then made a deduction for depreciation of 12 per cent., and thereafter made additions for overheads, cost of financing, working capital, and going value, and finally reached the figure $577,043.

These figures of the master are the subject of exceptions by the city and by the company, both as to the basic figures adopted and as to the various additions and deductions made by the master.

[1] I can see no valid objection to adopting the method of cost of reproduction new as a help to arriving at present reasonable value, provided proper revision be made whenever necessary, and providing other relevant facts are not ignored. Such method has been quite common, although not exclusive of other methods. But there must be ever kept in mind the ultimate purpose of the investigation, and also certain guiding principles laid down by the Supreme Court of the United States. The purpose of the inquiry is plainly indicated by the court in the case of San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 811 (43 L. Ed. 1154), where it is said:

"What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public."

The guiding principles are stated in a large number of cases in varying language, but in meaning substantially the same. The following citations will suffice:

In Smyth v. Ames, 169 U. S. 466, 547, 18 Sup. Ct. 418, 434 (42 L. Ed. 819), the court said:

"What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use * * * than the services rendered by it are reasonably worth."

In Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 Sup. Ct. 192, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034):

"And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase. This is, at any rate, the general rule. We do not say there may not possibly be an exception to it, where the property may have increased so enormously in value as to render a rate permitting a reasonable return upon such increased value unjust to the public. How such facts should be treated is not a question now before us, as this case does not present it. We refer to the matter only for the purpose of stating that the decision herein does not prevent an inquiry into the question when, if ever, it should be necessarily presented."

In the Minnesota Rate Cases, 230 U. S. 353, 434, 33 Sup. Ct. 729, 754 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), the court said:

"The basis of calculation is the 'fair value of the property' used for the convenience of the public, * * * or as it was put in San Diego Co. v. Na-

tional City, * * * 'what the company is entitled to demand in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' * * * The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts"—citing with approval Smyth v. Ames.

[2] As I understand the ruling of these cases, it is that the utility company is entitled to have a fair return upon the reasonable value of the property used and useful in rendering the service, and as of the time the service is rendered. This does not mean that the reasonable value is necessarily the same as the cost of reproduction new less depreciation estimated as of the time of the inquiry with additions made for overheads, etc.; nor does it mean that the reasonable value is necessarily the same as the original cost of construction less depreciation with similar additions; nor does it mean that cost of reproduction new less depreciation based on average prices for any series of years is necessarily controlling. But it does mean that all of these methods and others may be resorted to as aids in forming a judgment as to what is the present reasonable value. That there can be no mathematical certainty in such a judgment goes without saying. Nor does any formula exist which can be used in all cases. The most that can be expected is, quoting the language of Justice Hughes in the Minnesota Rate Cases, "a reasonable judgment having its basis in a proper consideration of all relevant facts." Hence the necessity of not being confined in the inquiry to unit prices prevailing on any given date, but of including in the consideration unit prices of the past as well as those of the present, and also the trend of unit prices as well as the reasons for the trend, and the probability or improbability of a change of trend. Hence also the necessity of considering the past history of the utility company, especially in fixing the value of such items as overheads, cost of financing, going value, and working capital.

The statement in Smyth v. Ames, 169 U. S. 546, 18 Sup. Ct. 418, 434 (42 L. Ed. 819), as to matters worthy of consideration in fixing reasonable value, has been approved in later cases, though the particular weight to be given to the several matters depends, of course, upon the facts in each particular case. That statement is as follows:

"And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property."

[3] After carefully considering the evidence in the present case, I have reached the conclusion that the master in taking as his basic figures for valuation of the physical property of the company that estimate representing the cost of reproduction new, based on prices prevailing May 1, 1919, and building up from those basic figures, has

arrived at a final valuation higher than can be considered reasonable in view of all the facts.

Apparently the master went upon the theory that cost of reproduction new should be the controlling factor, and that judgment was to be exercised mainly in selecting the date at which cost of reproduction should be calculated. In his report he states:

"The concensus of authorities is that the present value, i. e., the time when the valuation is being made for rate-making or other purposes, is the time at which the value of the property is to be determined, or to state the rule in another way, the reproduction cost new at the time the estimate is being made is the basis of valuation for the making of rates. This rule has been modified to the extent of diminishing the reproduction cost new by the ascertained amount of depreciation."

I do not exactly so understand the decisions of the Supreme Court; but, on the contrary, that all relevant facts are to be considered in reaching a judgment of what is a reasonable present value, and that cost of reproduction new, whether at the present time or at some other time, is but one of the relevant facts to be considered. Other relevant facts to be considered in the present case were: Original cost of the property, as nearly as it could be ascertained. No direct evidence as to this was introduced by either side, the city stating that it had been unable to obtain it, the company making no statement in regard to the matter so far as I have been able to learn from the record. Total capital invested in the property down to the present time, as nearly as it could be ascertained; this according to the evidence amounts approximately to $244,000. Rate of return earned by the company upon investment during past years; this according to the evidence has averaged 12.4 per cent. during the past ten years, including depreciation reserve. Evidence as to these last two matters was introduced by the city. Its accuracy and value are attacked by the company, but it is noticeable that the company offered no evidence itself in regard to these matters. The company did, however, introduce evidence showing that the amount available for depreciation and return on invested capital for the year ending December 31, 1919, was $28,185. Stocks and bonds outstanding: It appears from the evidence that the original capital stock was $60,000, later increased to $100,000. In 1905 this stock was sold for $175,000. In July, 1905, a mortgage for $300,000 was made. The amount of bonds issued or now outstanding does not appear. The present company, the defendant, purchased the property in 1912. Evidence as to the financial history of the prior companies, and of the present defendant company so far as it relates to the Winona properties, is extremely meager, so much so that it raises a suspicion of studied omission. Other facts and matters proper to be considered in connection with the estimates of the cost of reproduction are: The causes of the high prices since 1914; also, whether these causes still exist, and will continue for a considerable period; or whether there has already set in a decline in prices.

In connection with the inquiry as to recent decline in prices, it is to be noted that one of the expert witnesses for the company at the time of the hearing before the master testified that a fall in prices had already commenced and was expected to continue in materials at least.

It is also worthy of mention that since the hearing before the master and while this hearing on review has been pending, the decline in prices of commodities in general has been so continuous and so marked that the court will take judicial notice of the same. The materiality and importance of this decline in prices are shown by the following testimony of one of the witnesses for the company:

"The price variations on commodities in general I found, after many investigations of this kind, to be closely indicative of price variation in commodities used in the construction of gas plants, and as a matter of fact of utility plants in general."

It is but fair to add that the recent decline in prices of general commodities had not become marked at the time of the hearing before the master. It should also be added that the decline has not as yet materially affected the elements going to make up the holder cost of gas. Whenever such decline occurs it will be taken care of by the plan of periodical adjustment.

[4] The city's valuation: I do not think that the city's valuation, built up from the estimate of $175,031 as the value of the physical property, as of May 1, 1919, is fair and reasonable. The estimate is based on so-called "Normal Pre-War Construction Cost Depreciated"; and to this estimate is added 25 per cent. to get present value, and further additions are made for the actual items purchased subsequent to May 1, 1919, and for land and working capital, making a total of $251,697. The inherent vice in the method is the assumption that there is such a thing as a "normal construction cost." If this phrase means a cost of construction which in general conforms to a standard, and that variations in the cost of construction tend to correct themselves, and thereby bring the cost of construction back to the standard, then in my judgment the assumption is false. When analysis is made of the term "normal construction cost," it is apparent that it means construction at normal prices of labor and materials. The fact is that a study of standard charts of prices of material or of labor extending over a long period of years (long enough to get a broad survey) will convince the most skeptical that there is not now, and never has been, such a thing as normal prices, in the above sense, either for labor or materials. Prices of labor and materials are constantly changing, and therefore cost of construction of anything into which labor and materials enter will inevitably change also. So that while one may properly speak of average prices, or average cost of construction during a given period, the term "normal cost of construction" is entirely misleading.

The figures used by the city represent neither the average prices for a period nor prices at a particular date, but simply an opinion as to what should have been "normal" prices during a selected period. Depreciation figures of the city are grossly excessive.

After considering the various estimates as to valuation before the master and the evidence as to the same, and the past history of the company, and the amount of capital actually invested, and the rate of return earned by the company during the past ten years upon such investment, and all other matters deemed relevant, I have reached the

conclusion that the following estimate should be adopted as the present reasonable value of the properties of the company at Winona:

| | |
|---|---:|
| Valuation of total physical property, less land | $350,000 |
| Overhead, 15 per cent | 52,500 |
| | $402,500 |
| Depreciation, 12 per cent | 48,300 |
| | $354,200 |
| Land | 8,960 |
| | $363,160 |
| Working capital | 25,000 |
| | $388,160 |
| Going value, 6 per cent | 23,289 |
| Total present reasonable value | $411,449 |

An 8 per cent. return on this valuation would give $32,915.92, which would be equivalent to 43 cents per thousand cubic feet of gas sold.

Much has been said on the part of counsel for the plaintiff as to the propriety of following the method adopted by the master in the Minneapolis Gas Company case in arriving at a fair valuation. It may be of interest to note that a valuation made up by following the method of the master in that case as nearly as practicable, making due allowance for differences in the character and location of the plants and the history, etc., of the two companies, amounts to a figure only about $40,-000 less than the figures which I have above adopted.

[5] In the foregoing table I have adopted the percentages used by the master as to overheads, depreciation, and going value, and also the master's figures as to working capital. I have some doubt whether 12 per cent. for depreciation is not too great, in view of the evidence as to the present efficiency of the plant, my view being that depreciation is something to be concretely determined by inspection, rather than by a theoretical yardstick, and that present efficiency is a very important factor; that even though the life of some of the elements of the physical property will not long continue, yet that this is a matter to be taken care of by depreciation reserve; and that, if the plant is practically as efficient as a new plant, the deduction from valuation on account of depreciation should be very slight. However, there is evidence of some present inefficiency, and I have concluded to allow the 12 per cent. in the present case, as did the master.

[6] I have eliminated entirely the item of cost of financing. Not but what such an item is proper in cases where the evidence shows such expense was incurred, but I have been unable to find any such evidence in the present record. There is evidence as to what the cost of financing would be in a reproduction of the present plant on the different bases proposed but in my judgment this is not enough. The reproduction method may theoretically call for such an item as cost of financing, but in making a reasonable valuation for rate-making purposes, I do not think that items which are theoretical only, so far as the case in hand is concerned, should have any place. In my judg-

ment the cost of financing stands on the same basis as a theoretical replacement of pavement which has never in fact been disturbed. The exclusion of the latter item was approved in the case of Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172, 35 Sup. Ct. 811, 59 L. Ed. 1244.

[7] It might be said that the foregoing criticism on cost of financing would apply equally to some of the items included in "overheads." To some extent this is true, and I should feel much better satisfied if the evidence had shown that all of the items of expense included in overheads had been actually incurred in the construction of the Winona plant and placed in capital account.

There is this to be said, however, that it is practically certain from the very nature of the items included in overheads that expense items of such nature were actually incurred, whereas in respect to the item, cost of financing, it seems practically certain in my mind that in the construction of this small plant at Winona no such item of expense was actually incurred.

The depreciation reserve computed at the rate found by the master, 2½ per cent. upon $286,569, the value of the total physical properties, less land and less benches, will be $7,164.20, equivalent to 9 cents per M cubic feet of gas sold and used.

[8] The costs of this litigation should not in my judgment be included among the items going to make up the rate for gas sold. Each party should pay one-half the master's fees and of the court costs. Other expenses and disbursements should be borne by the party incurring the same.

The rate built up of the foregoing figures will be as follows:

Operating cost ...................................................... $1.41
Return on present reasonable value ................................. .43
Depreciation reserve .............................................. .09
                                                                  _____
    Total ........................................................ $1.93

[9] The master has recommended that the price of gas be adjusted at intervals of four months, based upon variations in the net holder cost of gas during the preceding four months. I approve this recommendation; such a plan has been followed in the Minneapolis Gas Case, and is working satisfactorily. Making a needful change in the master's figures, pointed out by counsel, due to a different method of handling leakage, the net holder cost is found to be 95 cents per M cubic feet of gas sold. In my judgment this variable element should be reduced by deducting the items of current maintenance or repairs, included in such net holder cost. These are as follows:

Maintenance of boilers, per M cu. ft. of gas sold...................... .008
Maintenance of benches ............................................. .035
Maintenance of coal gas apparatus .................................. .020
Maintenance of gas buildings ....................................... .009
                                                                  _____
    Total ........................................................ .07.

These amount to 7 cents per M cubic feet of gas sold, which being deducted from 95 would leave the variable element on which to base

the adjustments each four months 88 cents. The reason for eliminating the items of current repairs is to avoid disputes likely to arise each four months on the question whether certain items of expense should be classed with the repair items included in the net holder cost, or with the maintenance items covered by the depreciation reserve fund.

[10] Finally, in my opinion there should be, as suggested by the master, an opportunity for revaluations of the properties of the gas company when circumstances warrant; but not oftener than each five years, each valuation to be used as a basis upon which a return should be made during a succeeding period. An inventory has already been taken. Additions thereto can easily be made from time to time, and unit prices are readily obtainable. Such readjustments of valuation need not interfere with readjustments of rates based on changes in net holder cost. Though I recognize that such a plan is not free from objections, yet I believe that a rate, adjustable each four months, in accordance with variations in net holder cost of gas, less repairs, and further adjustable, when necessary, in accordance with variations in property values, would be practicable and fair to all parties concerned.

Except as disposed of in the foregoing decision, the several exceptions by plaintiff and by defendant to the master's findings and report are hereby overruled, and exceptions allowed.

Decree in accordance with the foregoing views will necessarily be somewhat different from the form of decree recommended by the master. A decree, therefore, may be drawn by counsel, and submitted to the court for approval. If counsel cannot agree upon the form, their differences may be submitted to the court. It should be borne in mind that the decree to be entered, though called a final decree, is effective, so far as rates are concerned, only until a valid gas rate applicable to the defendant company is promulgated by the city of Winona or by some competent authority.