## CITY OF MINNEAPOLIS v. RAND et al. RAND et al. v. CITY OF MINNEAPOLIS. MINNEAPOLIS GASLIGHT CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. January 8, 1923.)

Nos. 5882–5884.

1. **Constitutional law �køø70(3)—Court without jurisdiction to fix rates.**
    The making of rates to be charged consumers by a gas company or other public utility is a legislative and not a judicial function, and a court is without jurisdiction to change rates fixed by a legislative body.

2. **Gas ⊕øø14(2)—Receiver not entitled to maintain ancillary suit to change rates fixed by ordinance.**
    A city ordinance granting a franchise to a gas company authorized the city council to fix rates, the reasonableness of which should be subject to review and correction in a suit which might be brought by the company for the purpose. A federal court in a creditors' suit appointed a receiver for the company, who by direction of the court adopted the ordinance and filed an ancillary bill against the city for review and correction of the rates fixed by the city council. *Held*, that such suit by the receiver was not the suit contemplated by the ordinance, and that the court was without jurisdiction to revise and change the rates fixed by the council.

3. **Gas ⊕øø14(1)—Court may fix rates to be charged by receiver of gas company.**
    A court, which has appointed a receiver for a gas company, may, on petition by the receiver for instruction, fix the rates to be charged by him for gas during the receivership.

4. **Gas ⊕øø14(1)—Rate to produce a fair return should be based on the fair value of its property used at the time.**
    In determining what rate will enable a gas company or other public utility to earn a fair return, its property used is to be taken at its fair value at the time the rate is in force, and whether it earned more or less than a fair return in the past does not affect the question.

5. **Gas ⊕øø14(1)—Valuation of property of gas company for rate purposes.**
    Under the rule of the Supreme Court that the present fair value of the property of a gas company used in the public service is to be taken as the basis for fixing reasonable rates, the company is entitled to such value, even though it has been increased as the result of enhanced war prices.

6. **Gas ⊕øø14(1)—Valuation of property of gas company for rate purposes.**
    Neither the original cost nor the present cost of reproduction is always a fair measure of the present value of the physical property of a gas company for rate-making purposes; but, where the plant has been in use for a number of years, an allowance must be made from either cost for depreciation.

7. **Gas ⊕øø14(1)—Valuation of property of gas company for rate purposes.**
    In the valuation of the property of a gas company for rate-fixing purposes, construction or reconstruction cost should not be estimated, on

⊕øøFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the assumption that the company was without means and obliged to borrow money or sell securities at large discounts, but upon the basis of its financial ability to build the plant and pay reasonable prices therefor.

8. Gas �köð 14(1)—In valuation of established plant of gas company, a sum must be allowed for going value.

In the valuation of the property of a gas company which has an established plant for rate-fixing purposes, a reasonable sum should be added to the physical valuation for going value, apart from any allowance for good will.

9. Gas ⊫ö 14(1)—Rates fixed on the basis of a return of 7½ per cent. held reasonable.

Rates to be charged by the receiver of a gas company, fixed on the basis of 7½ per cent. as a fair return, approved.

Stone, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Minnesota; Wilbur F. Booth, Judge.

Suit in equity by Alonzo T. Rand and others, receivers of the Minneapolis Gaslight Company, wherein the Minneapolis Gaslight Company intervened, against the City of Minneapolis. From a decree fixing rates, both parties appeal. Decree modified.

J. O. P. Wheelwright, of Minneapolis, Minn., and Pierce Butler, of St. Paul, Minn. (D. F. Simpson, of Minneapolis, Minn., on the brief), for Minneapolis Gaslight Co. and its receivers.

R. S. Wiggin, of Minneapolis, Minn. (Neil M. Cronin and William H. Morse, both of Minneapolis, Minn., on the brief), for city of Minneapolis.

Before SANBORN and STONE, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge. From a decree fixing rates to be charged for gas in the city of Minneapolis, separate appeals are prosecuted by the Minneapolis Gaslight Company (hereafter called company or gas company), the receivers of that company, and the city of Minneapolis. Franchises had been granted to predecessors of the gas company, permitting the manufacture and distribution of gas to the city and to its citizens for a limited period, and allowing the city to purchase the plant at certain times. The gas company acquired these franchises and the gas plants, and shortly before the date when the city might have elected to have purchased the plant a new contract was made between the gas company and the city and embodied in a city ordinance approved February 24, 1910. This ordinance fixed a rate to be charged for gas by the gas company, and provided that the city council might thereafter fix the rates to be charged by the company for gas, but not oftener than once in five years, and that the rates which should be fixed by the city council should always be just and reasonable, and should afford a fair and reasonable return upon the company's capital investment, and that the term "capital investment" should mean the fair and reasonable value of the gas plant as a going concern, having regard to its condition of repair and its adaptability and capacity for generating gas, and, in determining the

⊫ö For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

plant's value, no value should be placed upon good will, upon the unexpired term of any franchise, or future profits based upon any unexpired term of the franchise, and no regard should be given to the company's capitalization, as represented by its outstanding stocks and bonds. The ordinance contained a provision that the reasonableness of the rates should always be subject to review and correction in any action or proceeding which should be instituted therefor by the gas company in any court having jurisdiction of the subject-matter.

The city council passed an ordinance in 1913 fixing gas rates for the five-year period ending December 31, 1918. Another ordinance was passed by the city council on January 10, 1919, fixing rates for the five-year period beginning January 1, 1919, and making a different rate for each of the years, and this latter ordinance is the one now challenged in this suit. The gas company complied with the rates fixed for 1919. On January 26, 1920, in a creditors' suit against the gas company in the United States District Court for the District of Minnesota, a receiver was appointed for the property of the gas company, and by a later order the receiver was given leave to file an ancillary and dependent bill against the city of Minneapolis for the purpose of having the rates for gas prescribed by the ordinance of 1919 reviewed and corrected, and for the purpose of having fixed by the court a temporary rate for gas to be charged to consumers, pending the final determination of the case upon its merits.

The receiver adopted the ordinance of 1910 and began this suit, challenging the rates fixed for gas for the years subsequent to 1919, alleging in his bill that they did not afford a fair and reasonable return on the gas company's capital investment, as that term was defined in the ordinance of 1910. The prayer of the bill was for the court to fix the value of the company's capital investment, to review and correct the rates fixed by the ordinance of 1919, to fix a rate that should comply with the ordinance of 1910, and to fix a temporary rate that the receiver should be authorized to apply and collect. The gas company was allowed to intervene. The city put in issue the allegations of the bill of the receiver and of the gas company, and a master was appointed, who heard the testimony in an extended hearing, and he made an elaborate report, stating his conclusion as to the facts and as to the law applicable thereto. The master afterwards made one important amendment to his report. The court affirmed the master's report and entered a decree in conformity to it, fixing the value of the capital investment of the gas company, and fixing the rates to be charged for gas during the receivership and until the end of 1923, and thereafter until a new ordinance was passed fixing rates to be charged for gas. The master's findings as to operating costs are not in question, and the only issue now in controversy is the amount of return that should be allowed to the owners of the company.

[1] The first question presented is the claim of the city that the court had no jurisdiction to entertain the bill filed by the receiver asking the court to fix a rate to be charged for gas, because the receiver elected to stand upon the ordinance of 1910, and asked the court to exercise a mere legislative function in establishing the rates

to be charged. In support of the jurisdiction it is claimed that the bill of the receiver is an ancillary and dependent suit authorized to be carried on in support of the main suit. In a proper case the receiver may maintain in the original suit a dependent suit in aid of the objects of the original suit (White v. Ewing, 159 U. S. 36, 39, 15 Sup. Ct. 1018, 40 L. Ed. 67; In re Tyler, 149 U. S. 164, 181, 13 Sup. Ct. 785, 37 L. Ed. 689; Rouse v. Letcher, 156 U. S. 47, 50, 15 Sup. Ct. 266, 39 L. Ed. 341; Blair v. Chicago, 201 U. S. 400, 450, 26 Sup. Ct. 427, 50 L. Ed. 801); but the bill of the receiver in this case did not disclose a separate suit in equity between himself, as receiver, and the city. In substance it asserted that under the city ordinance the city had agreed that rates for gas should be so fixed as to yield a reasonable return upon the company's capital investment, and that the questioned rates would not yield that return, nor enable the receiver to continue in the operation of the gas plant, and that they were unfair and unreasonable and a breach of the contract evidenced by the ordinance of 1910. It also alleged that, because the court had ordered the receiver to adopt the contract evidenced by the ordinance of 1910, the court should review and correct the rates established by the ordinance of 1919 and should fix a temporary rate, and the prayer of the bill was that the court review and correct the rates fixed by the ordinance of 1919, and fix and determine a rate that should comply with the ordinance of 1910, and fix a provisional rate for the receiver to apply until final decree in the case. The making of rates to be charged consumers by public utility companies is a legislative and not a judicial function, and therefore the court had no jurisdiction to grant that relief in an independent or a dependent suit. St. L. & San Francisco Railway Co. v. Gill, 156 U. S. 649, 663, 15 Sup. Ct. 484, 39 L. Ed. 567; Interstate Com. Commission v. Railway Co., 167 U. S. 479, 499, 17 Sup. Ct. 896, 42 L. Ed. 243; Int. Com. Com. v. Alabama Midland Ry., 168 U. S. 144, 162, 18 Sup. Ct. 45, 42 L. Ed. 414; Minnesota Rate Cases, 230 U. S. 352, 433, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. In Newton v. Consolidated Gas Co., 258 U. S. 165, 42 Sup. Ct. 264, 66 L. Ed. ——, the court says:

"Rate making is no function of the courts and should not be attempted either directly or indirectly."

[2, 3] Jurisdiction to establish rates could not be, and was not, conferred upon the United States court by the terms of the city ordinance of 1910 providing that the reasonableness of the rates for gas should be subject to review and correction in any action or proceeding instituted therefor by the company in any court having jurisdiction of the subject matter. The bill does not present a suit for an injunction and contained no prayer for any injunction, temporary or permanent, against the enforcement of the rates which were assailed. The bill is not a suit in the common method of reviewing and correcting a rate, by means of a bill asking an injunction against its enforcement, as was attempted in Minneapolis Gaslight Co. v. City of Minneapolis, 123 Minn. 231, 143 N. W. 728, by the same gas company. The receiver, acting under the direction of the court, adopted the con-

tract between the city and the gas company. The bill did present to the court, in the suit wherein he had been appointed, a petition by the receiver asking for advice and instructions as to the rates to be charged by him. A receiver has the right to apply, and in matters of importance it may be his duty to apply, to the court for instructions as to his duties. Grant v. Phœnix Life Ins. Co., 121 U. S. 118, 120, 7 Sup. Ct. 849, 30 L. Ed. 909; Stuart v. Boulware, 133 U. S. 78, 81, 10 Sup. Ct. 242, 33 L. Ed. 568; Scott v. Western Pac. R. Co., 246 Fed. 545, 546, 158 C. C. A. 515; Guaranty Trust Co. v. International Steam Pump Co., 231 Fed. 594, 145 C. C. A. 480; Beach on Receivers (2d Ed.) § 272. And the court had jurisdiction to entertain the bill of the receiver for this purpose. The effect of the master's report and of the court's decree was that the ordinance was invalid and that the receiver was not bound to comply with its terms. Each of the parties has appealed, and each questions the master's valuation of $8,000,000 placed upon the property of the gas company as of the date of January 1, 1920. This valuation was affirmed by the court. The value of the land of the company was stipulated, and is not in controversy.

Expert witnesses on behalf of the gas company gave detailed estimates of values of the other items of the company's physical property and of the cost of reproduction new on the basis of assumed average prices for five years ending July 1, 1918, on the basis of prices current as of July 1, 1918, and on the basis of prices current as of July 1, 1920. An allowance was made for depreciation on the physical property other than on the land of the company. To the balance was added estimated sums for what was called overhead charges, for cost of financing the company, and for its going value and also a sum as working capital. Expert testimony was given on behalf of the city, fixing a value of the company's property which was based upon what the witnesses declared was the normal reproduction cost, and this was explained as approximately the actual cost shown by the company's books, modified so as to be the fair market values at the time the company made the expenditures, and reduced by an allowance for depreciation. To this total were added special sums as the value of the franchises, for organization, general and legal expenses, and for interest and taxes during construction and for working capital. These witnesses asserted that any proper charges for incidentals and contingencies and for engineering and superintendence were included in the aggregate values of the physical property.

The master, in the method used by him in reaching a valuation of $8,000,000, stated that he had considered the claims of the company for charges for overhead expenses, cost of financing the company, and for its going value, but found that all items of overhead and all expenditures made to create going value had been charged to the operating expense account of the company from 1870 to 1914, and paid from the earnings, and that after these charges were paid the net earnings of the company were excessive, and more than a fair return upon the capital investment, and that there was no attempted public regulation of the earnings of the company until 1910. The master

concluded that, because the net earnings of the company were excessive prior to 1910, no allowance should be made for the overhead expenses, cost of financing, or for value as a going concern beyond his allowance of its value "as a going concern in successful operation." The master deemed the earnings to have been excessive because they exceeded a fair rate of return on the investment, although he did not find that the rates charged consumers had been unreasonable.

[4] It cannot be doubted that the police power may limit such a public utility to a reasonable rate of return upon the fair value of its property devoted to the public use; but, if such regulation has not been imposed, it cannot be said that the utility is not entitled to the profits it has made. The question is: What is now a reasonable rate? In Newton v. Consolidated Gas Co., 258 U. S. 165, 42 Sup. Ct. 264, 66 L. Ed. ——, the court said of a rate charged by a company for gas:

"Mere past success could not support a demand that it continue to operate indefinitely at a loss."

And in the case of Garden City v. Garden City Co., 236 Fed. 693, 696, 150 C. C. A. 25, 28, this court said:

"It is in effect claimed that the appellee must have charged excessive rates for the early years of its existence, when no charges were fixed by law, and invested these unjust exactions in the plant, and is now seeking to receive a return upon those illegal exactions. No judicial authorities are cited on this point. In the first place, there is no evidence that the company ever charged excessive rates until about the commencement of the controversy out of which this litigation arose; but, if it did so, the various parties from whom they were extorted had a cause of action against the company to recover the excessive rates until the statute of limitations had run. Presumptively they were not the identical persons who are now the consumers from the appellee. It is the practice of courts to try cases one at a time, and if the appellee has put money into the development of the plant, the court in this case could not stop to inquire just how it acquired the title to the money. Such a system would involve an investigation into the wholly collateral matter of the entire past life of litigants and the manner in which they acquired the money invested in a private enterprise."

See, also, Chicago Rys. Co. v. Illinois Commerce Commission (D. C.) 277 Fed. 970, 980.

The claim that past profits justify a present rate that is not reasonable is no more tenable than the converse contention that if a public service corporation has operated at a loss in prior years, it is therefore entitled to more than a reasonable present rate of return in order to make up for the past deficits. Knoxville v. Water Co., 212 U. S. 1, 14, 29 Sup. Ct. 148, 53 L. Ed. 371; Galveston Co. v. City of Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. —— (April 10, 1922); Georgia Ry. & Power Co. v. Railroad Commission (D. C.) 278 Fed. 242, 247.

The master states his method of finding the "capital investment" of the company as follows:

"I find that the 'capital investment' of the Minneapolis Gaslight Company, as that term is defined in section 5 of the ordinance of 1910, as of January 1, 1920, was $8,000,000, and reach that conclusion by taking the maximum rate base of $6,022,220, set forth in Defendant's Table 620 of Exhibit 7, as a start-

ing point. I then, after deducting the item of real estate, $381,686, increase the other items, amounting to $5,640,534, 25 per cent., which I think fairly recognizes and applies the rule laid down by the Supreme Court of the United States in the Willcox Case, 212 U. S. 19, 52, 29 Sup. Ct. 192, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), viz.: 'We concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase.'

"This produces $7,050,667.50, to which is added the value of the real estate agreed upon in this case, $381,461, and $567,871.50, allowance for working capital, which gives the total stated of $8,000,000. On the hearing, Mr. Maltbie, representing the defendant, conceded a fair allowance for working capital to be $450,000, while Mr. Baehr, leading expert for the complainant maintained that $750,000 would be necessary in order to enable the gas company to successfully conduct its business. During the taking of the testimony on this point, it appeared to me that the complainant's witnesses were using maximum quantities of supplies, and that those quantities were in excess of any ever carried by the gas company. I think the allowance made of $567,871.50 will enable the gas company to properly conduct its business."

The Table 620, which the master thus adopts, was prepared by an expert witness for the city, and allows as the value of the land $381,-686, of the other physical property $4,943,017, for franchises $60,515, for organization, general, and legal expenses $10,000, for interest and taxes during construction $227,002 and for working capital $400,000, a total of $6,022,220. The table mentions incidentals and contingencies, but says they are included in the value of the three items of land, other tangible property, and franchises. It also mentions engineering and superintendence, and says that these items are partly included in the same three items. Cost of financing is noted as covered by the rate of return, except so far as included in other items allowed. Going value is also mentioned, with the comment, "No deficiencies in earnings—plant appraised as going concern." Exception was taken by the city to the master's allowance of $567,871.50 as working capital for the company, upon the ground that the Table 620 had already included an item for this purpose of $400,000, and the master had increased it by 25 per cent., making an allowance of $500,-000, which, with the $567,871.50 also allowed for the same purpose, made a total of $1,067,871.50, or far more than the highest estimate made by any witness of the amount needed for this purpose. Thereupon the master overruled the exception and amended his report as follows:

"After duly considering the exceptions so filed, it is ordered that said exceptions, and each and all of the same, be and they are hereby overruled and disallowed. In overruling the exceptions filed I only deem it necessary to add that it was my purpose and intention, reached after long deliberation, to fix a valuation of $8,000,000 (including in this sum a fair allowance for working capital) on the properties of the Minneapolis Gaslight Company. The explanation made in connection with the original finding leaves this somewhat in doubt, and that doubt should be eliminated.

"Having reached the conclusion that the fair value of the property, including a fair allowance for working capital, was $8,000,000, I first turned to the complainant's valuation of $13,795,831.00, obtained on the basis of average prices for five years ending July 1, 1918, and cut that amount down to $8,000,-

000. Later, I concluded to take the figure $6,022,220, defendant's maximum rate base, and build up from that point to $8,000,000, and overlooked the fact that that figure contained an item of $400,000 working capital. In order that there may be no ambiguity or misunderstanding on this point, the finding in question is stricken from the original report, it being my intention to strike out that portion of the same reproduced by the counsel for the defendant city in connection with his sixth exception, and the following is substituted in lieu thereof: 'I find that the capital investment of the Minneapolis Gaslight Company, as that term is defined in section 5 of the ordinance of 1910, as of January 1, 1920, was and is $8,000.000, in which is included as a fair allowance for working capital $567,871.50.' "

If the effect to be given to this report as amended is a mere general finding of the amount of the "capital investment," without a statement of the elements entering into the computation, the case should be again referred for a more detailed finding of the facts. Chicago, Milwaukee, etc., Ry, v. Tompkins, 176 U. S. 167, 179, 180, 20 Sup. Ct. 336, 44 L. Ed. 417; Lincoln Gas & Electric Light Co. v. Lincoln, 223 U. S. 349, 361–365, 32 Sup. Ct. 271, 56 L. Ed. 466. But we interpret the master's report as adopting the base of valuation and the separation into divisions of property shown by the city's expert in Table 620. Otherwise, the master's original report would not afford information as to the valuations of any portion of the company's property and by the amendment he would add a half million dollars to the valuation, without assigning any basis for that action. We think the city's exception to the amended report, because it embraces a double allowance for working capital, should have been sustained, and, as the master expressly states in his amended report that he allows the sum of $567,871.50 as working capital, that the valuation of $8,000,000 should be reduced by the sum of $500,000, which was at first allowed as an item for working capital.

The master's valuation of the physical property of the company other than land is questioned by both the city and the company and its receivers. The fair value of the property at the time it is being used by the public is the proper test. Smyth v. Ames, 169 U. S. 466, 546, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; Stanislaus County v. San Joaquin C. & I. Co., 192 U. S. 201, 215, 24 Sup. Ct. 241, 48 L. Ed. 406; Minnesota Rate Cases, 230 U. S. 352, 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Denver v. Denver Union Water Co., 246 U. S. 178, 191, 38 Sup. Ct. 278, 62 L. Ed. 649; Houston v. Southwestern Bell Telephone Co. 259 U. S. 318, 42 Sup. Ct. 486, 66 L. Ed. —— (May 29, 1922). The city contends for a valuation which it calls a normal reproduction value, less depreciation, and its opponents for a value based upon an assumed cost of reproduction anew of the plant, less depreciation. The master was confronted by evidence on the part of the city showing approximately the actual costs of the items of the company's property at the times when they were put into the plant, as derived from the company's records, less an assumed depreciation. On the part of the company and receivers he heard testimony of experts who assumed to value the component parts

of the plant on the basis of the average prices of such parts prevailing for the five years ending July 1, 1918, making a total of $8,588,155, and on the basis of prices current on July 1, 1918, making a total of $11,839,625, and on January 1, 1920, making a total of $13,242,953, and an assumed depreciation to be deducted from each. The problem for the master was to find the fair value of the property applicable to base rates upon for the years 1920, 1921, 1922, and 1923, or for so much of that period as the receivers should be in need of direction from the court.

The master's finding of this value of $4,943,017 was made by taking the approximate actual costs of the physical property, other than land, estimated by the city's experts as $6,485,777 and subtracting an assumed average depreciation of about 24 per cent. and then adding to the remainder the sum of 25 per cent. to obtain its value at the time in question, January 1, 1920. The evidence is undisputed that the cost prices of this property are far below the market prices of such articles at the end of 1919. The greater portion of it was purchased before 1914, and before the advance in prices incident to the war had begun. It was shown that the prices of labor and materials, such as are required in the construction of a plant of this nature, had advanced in varying amounts from 1914 to 1920, many classes having advanced from 100 to 300 per cent. It was shown that between 1910 and 1920, prices of 15 classes of building materials, such as are used by the gas company, had increased 139 per cent., skilled labor 92 per cent., common labor 150 per cent., cement 140 per cent., lumber 215 per cent., and common brick 123 per cent.

[5] The master stated that he found it perplexing to fix a valuation, in view of the decisions of the Supreme Court of the United States requiring the value to be fixed as of the time that the matter of rates was under consideration, and declaring that an utility was entitled to any increase in the value of its property since it was acquired; but, while he stated that he thought his valuation of $8,000,000 fairly recognized this rule, he cited with approval the decisions of other courts and commissions, which had held that a valuation of property of this nature should not be based upon prices prevailing during a period when the influence of the war had made such prices abnormal, and the master concluded that it was unfair to the public to use the method of reproduction new, at prevailing prices, or to use "the abnormal prices of to-day," in valuing this property. The master also found that the costs of the iron and steel pipe used in the mains of the company had increased 169 per cent. and 124 per cent. since 1910, and that these percentages, if applied to the cost of the mains as found by the city's expert, would result in a sum almost equal to the total valuation placed upon all of the property of the gas company. He also found the cost of gas meters had increased 65 per cent. since 1910, and that everything used by the gas company in its construction work had correspondingly increased in price, so that, if the prices then prevailing were applied to the property of the company, it would result in a valuation between two and three times the valuation he had placed upon it.

The difficulties of the situation thus pointed out by the master are obvious, but the everyday transactions of business are founded upon values existing at the time of the transactions. In valuations of public utilities, there has been some doubt expressed by courts and commissions having the duty in charge, as to what importance is to be given to prices as affected by the conditions resulting from the war, as may be seen in a review of many cases in a note to Petersburg Gas Co. v. City of Petersburg, 20 A. L. R. 542, 589; but the rule established by the decisions of the Supreme Court of the United States, which have been cited is that the fair value at the time in question must be taken, and this rule has been applied, although the war and its results have advanced prices far beyond the ordinary prices existing before the war. Potomac Electric Power Co. v. Public Utilities Com'n., 276 Fed. 327, 329, 51 App. D. C. 77; Consolidated Gas Co. of New York v. Newton (D. C.) 267 Fed. 231, 232, 234, 236; St. Joseph Ry., Light, H. & P. Co. v. Public Service Com'n (D. C.) 268 Fed. 267, 269; Joplin & P. Ry. Co. v. Public Service Commission (D. C.) 267 Fed. 584, 587; City of Winona v. Wisconsin-Minnesota Light & Power Co. (D. C.) 276 Fed. 996, 1002; New York & Queens Gas Co. v. Newton (D. C.) 269 Fed. 277, 289; Elizabethtown Gas L. Co. v. Board of Public Utility Commissioners, 95 N. J. Law, 18, 19, 111 Atl. 729; Petersburg Gas Co. v. City of Petersburg (Va.) 110 S. E. 533, 20 A. L. R. 542.

The gas company is entitled to the fair value of its property, even though that value has been increased as a result of the war, just as the laborer, the merchant, the manufacturer, the owner of land, and the lender of money may require the prevailing prices for what they furnish. We recognize the practical difficulty in fixing this fair value to apply to the years 1920 to 1923, inclusive, if occasion requires the valuation to continue so long, inasmuch as the value fixed by the witnesses as fair for January 1, 1920, may prove not to be the fair price thereafter. The valuation to be made is in part based upon experience and observed prices and in part upon prophecy of the range of prices for several years thereafter. We are authorized to take notice that no marked recession of prices has taken place since the time this case was heard by the master and that there is no present appearance of an assured reduction. Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 268, 39 Sup. Ct. 454, 63 L. Ed. 968; Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. —— (April 10, 1922). Our conclusion is that the master's increase of the undepreciated cost price of $6,485,777 by 25 per cent. is too low, and that this base should be increased by 50 per cent., or $3,242,888, making a total undepreciated valuation of the physical property of $9,727,665.

[6] The master allowed a rate of depreciation from the gross value found by him that averaged about 24 per cent. Assignments of error on behalf of the company and receivers question this deduction. Witnesses on its behalf testified to depreciation that averaged nearly 8 per cent. of their estimated values of the property. While economists and engineers differ as to the proper method of meeting charg-

es for wear and obsolescence, it is common experience that old articles that deteriorate by use are not of the same value as new articles of the same kind. In Knoxville v. Water Co., 212 U. S. 1, 10, 29 Sup. Ct. 148, 151 (53 L. Ed. 371) the court said, in speaking of the value of a plant for furnishing water to consumers in a city:

"The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years. The items composing the plant depreciate in value from year to year in a varying degree. Some pieces of property, like real estate, for instance, depreciate not at all, and sometimes, on the other hand, appreciate in value. But the reservoirs, the mains, the service pipes, structures upon real estate, standpipes, pumps, boilers, meters, tools, and appliances of every kind begin to depreciate with more or less rapidity from the moment of their first use. It is not easy to fix at any given time the amount of depreciation of a plant whose component parts are of different ages, with different expectations of life. But it is clear that some substantial allowance for depreciation ought to have been made in this case."

In the Minnesota Rate Cases, 230 U. S. 352, 457, 458, 33 Sup. Ct. 729, 763 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), the court said with reference to the property of a railway company:

"It would seem to be inevitable that in many parts of the plant there should be such depreciation, as, for example, in old structures and equipment remaining on hand. And when an estimate of value is made on the basis of reproduction new, the extent of existing depreciation should be shown and deducted. * * * And when particular physical items are estimated as worth so much new, if in fact they be depreciated, this amount should be found and allowed for. If this is not done, the physical valuation is manifestly incomplete. And it must be regarded as incomplete in this case. Knoxville v. Knoxville Water Co., 212 U. S. 1, 10."

We cannot accept the theory of the company that there is no deductible depreciation, if the plant functions well, with the appliances it uses, as the question is not whether the plant is efficient, but what is the fair value. Its own witnesses concede a measure of depreciation, and claim to have based their estimates upon observation of its component parts; but it appears that the observations were made in 1918, and it is not claimed that any detailed observation was made of the buried mains of the company. Whatever observation was made, the percentages of depreciation assigned are but estimates. The company criticizes the estimate made by the city's witnesses, because of the use of the "straight line" method; that is, reducing the original cost value of an article in the proportion that the period it has been in use bears to its total useful life.

The questions involved are simplified by an agreement of what was the useful life period for all of the classes of property. Each case must be decided on its own circumstances, and no general rule can be given for applying depreciation charges. The useful life of iron and steel pipe underground, exposed to deterioration from the elements, and the capability for prolonged service of machinery in active use in making and distributing gas, and of the structures that are connected with that work, can best be determined by witnesses whose experience and observation qualify them to give opinions on

such matters. After careful consideration, we are unable to say that in this case the master's conclusion as to the percentage to be adopted was erroneous. See Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. —— (April 10, 1922). Applying the percentage of depreciation found by the master (23.78682 per cent.) reduces the valuation of the physical property heretofore stated from $9,727,665 to $7,433,763.

[7] There is a wide variance between the claims of value for items other than land and the physical property. Expert witnesses for the company claimed the allowance of large sums for cost of financing the company, for its "going value," and for what it calls "overhead charges," including in that term items for assumed cost of engineering, organization, administration, and legal expenses during the construction period, interest and taxes during the same period, and an allowance for contingencies in case of reproduction of the plant anew. As has been stated, the master adopted a valuation that embraced an allowance for organization, general and legal expenses, and for interest and taxes during construction, as well as for the cost of the franchise. The items are hypothetical, and assume a probable cost, in the opinions of the witnesses, in case a plant like the company's was now to be reproduced. The cost of financing is assumed upon the theory that a company, desirous of establishing such a plant, should not be possessed of sufficient capital to pay for the plant, and should be compelled to borrow money by floating securities through brokers, and should be exposed to large discounts, if compelled to obtain money in this way. The fair value of the plant should not be estimated upon such a basis of impecuniosity and exactions, but upon the theory, if used, of reconstruction, by those financially able to build the plant, paying reasonable prices therefor. Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 42 Sup. Ct. 351, 66 L. Ed. —— (April 10, 1922).

In the case of Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 Sup. Ct. 811, 59 L. Ed. 1244, the court referred to expenses of the nature of those now under consideration as usually included in the term "going value," and referred to the item of going value as also including that sum which represents the added value of the plant as a whole over the sum of the values of the component parts (Knoxville v. Knoxville Water Co., 212 U. S. 1, 9, 29 Sup. Ct. 148, 53 L. Ed. 371), and declared that there is an element of value in an assembled and established and successful plant, which is a property right and one to be considered in a valuation of the property. The master had allowed an amount of 15 per cent. upon the base value, other than land, for overhead expenses of the general nature of those claimed in this case, and an additional sum for organization expenses, and certified that he had fixed the value of the plant on the basis of one in successful operation, and this action was held to be a sufficient consideration of the element of going value. In Denver v. Denver Union Water Co., 246 U. S. 178, 191, 38 Sup. Ct. 278, 62 L. Ed. 649, the court adhered to its ruling in the Des Moines Case, that the element of going value, because of an assembled and successful plant in op-

'eration, must be considered, and held an allowance of $800,000 for this element in a plant valued at about $13,500,000, was not open to serious question by the city.

[8] As we have seen, the master in this case refused to allow any sum for going value, except so far as it was included in the value placed by him on the property of the company as a going concern, because whatever expenditures had been made by the company to create going value had been charged to the operating expense account and had been paid from the company's earnings at a time when the profits of the company were regarded by him as excessive. Under the circumstances of this case, the allowance of the value of the physical property cannot properly be said to embrace the element of going value, as that allowance is for no more than the value of the component physical parts of the plant, as assembled in one plant in successful operation. A reasonable amount for going value, apart from any allowance for good will, in accord with the general practice in valuation cases, should be added to the items allowed by the master, and that amount is fixed at the sum of $500,000. See Pacific G. & E. Co. v. City and County of San Francisco (D. C.) 273 Fed. 937, 940.

[9] The master fixed a gas rate, based upon an assumed rate of return therefrom to the owners of the gas company of 7½ per cent. on the value of the property and this is challenged by the city as excessive. It is said that the company's bonds draw less interest, and therefore the stockholders will obtain more than 7½ per cent. in dividends upon their stock. It is obvious that this argument would not be of force, if the company were free from debt. It may be that the bonds of the company were sold at a discount; but, if the company had the good fortune to sell its bonds at less than this rate of interest, that fact should not diminish the rate of return on the total value of the company's property. Neither could more than a fair return be demanded, if the company had the misfortune to be compelled to pay more than 7½ per cent. for money borrowed. The only testimony as to the local rate of returns required for such investments at Minneapolis at that time shows that 8 per cent. would be required. In the case of Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 267, 39 Sup. Ct. 454, 63 L. Ed. 968, the court refused to approve a finding that a rate of 6 per cent. could not be regarded as confiscatory, when the undisputed evidence showed that 8 per cent. was the lowest rate sought and generally obtained as a return on capital invested in banking, merchandising, and other business in the vicinity, and that 7 per cent. was the legal rate of interest in Nebraska. In this case the ordinance contract provides that the Minneapolis Gas Company shall receive, not a rate of return that is not confiscatory, but one that is a fair and reasonable return upon its capital investment. The finding of the master is not shown to be erroneous.

At the hearing before the master, the city offered in evidence contracts between the cities of St. Paul and Duluth, Minn., and companies furnishing gas to consumers in those cities, as evidence of what would be a reasonable rate to be charged by the Minneapolis

Gas Company. They were excluded, and an assignment of error raises the propriety of this ruling; but we think there was no error in their exclusion, as the conditions were not shown to be similar, in the production and sale of gas, but were shown to be materially different in the plants and methods of producing or purchasing gas which they sold. In offering the contracts the city said that the theory of the offer was that the Minneapolis Gas Company could furnish gas more cheaply, if it had sufficient capacity to make coal gas, or could buy gas as a by-product from a coke oven plant, as the plant at Duluth was able to do. It follows, from what has been said, that the rate base should consist of the following items: Land, $381,686; other tangible property, $7,433,763; items of franchise, organization, general and legal expenses, interest and taxes during construction, as the master found them, $371,896.25; working capital, as found by master, $567,871; additional going concern value, $500 000—total, $9,255,216.25, and the price of gas should be so fixed as to yield 7½ per cent. interest upon this valuation, and the decree should be modified accordingly.

The decree should also be modified, so as to apply only to the actions of the receivers and to their authority to charge these rates, and to continue only during the time the receivers for the company are in charge, and until rates shall again be fixed by the city council of Minneapolis pursuant to the ordinance of 1910, and should provide that the parties may hereafter apply to the court for further instructions to the receiver, if values and rates or other circumstances shall be shown that make it inequitable that the rates fixed by the decree shall longer remain in force. These changes of valuation will make it necessary to modify the decree in the price to be charged for gas, and the cases will each be remanded, with directions to modify the decree to conform to the new valuation, and to the principles announced herein; each party to pay his own costs in this court.

STONE, Circuit Judge (dissenting). I am compelled to dissent from the above result and from some of the reasoning supporting that result. The only error I find in the result reached by the master and the trial court is that the master failed to allow for "going concern" value. I agree that the allowance for such item, under the circumstances of this case, should be $500,000. With this allowance added to the total value found by the master and the trial court. the total value would be $8,500,000. The above total value ($8,500,000) should, in my judgment, be the rate base upon which a return of 7½ per cent. return should be allowed.