## MUSCATINE LIGHTING CO. v. CITY OF MUSCATINE.

(District Court, S. D. Iowa. March 24, 1919.)

1. CORPORATIONS ☞394—PUBLIC UTILITIES—REGULATION OF CHARGES.
   Code Iowa, § 725, empowering municipalities to "regulate and fix" public utility rates, authorizes the rate to be fixed by contract with the utility company, subject to revision by the municipality.

2. STATUTES ☞238—CONSTRUCTION—FRANCHISES—LEGISLATIVE GRANTS.
   Public utility franchises, granted under legislative authority, are construed most strongly against the grantee.

3. ELECTRICITY ☞11—GAS ☞14(2)—CHARGES—CONTRACTS—REVISION BY COURTS.
   Franchise contracts, fixing rates to be charged for lighting, cannot be revised by the courts because the rates have become noncompensatory, although the municipality reserved the right to revise the rates.

4. CONSTITUTIONAL LAW ☞43(1)—WAIVING RIGHTS.
   Individual constitutional rights may be waived.

5. CONSTITUTIONAL LAW ☞242, 298(7)—ELECTRICITY ☞11—GAS ☞14(2)—FOURTEENTH AMENDMENT—CONFISCATORY RATES.
   The fact that lighting rates fixed by franchise contracts later became confiscatory because of changed industrial conditions does not deprive the utility of its property without due process or deny it equal protection of laws, in violation of the Fourteenth Amendment.

In Equity. Suits by the Muscatine Lighting Company against the City of Muscatine, by the Ft. Madison Gaslight Company against the City of Ft. Madison and others, by the Iowa Gas & Electric Company against the City of Mt. Pleasant and others, by the Southern Iowa Electric Company against the City of Chariton, and by the Iowa Electric Company against the City of Fairfield. Recommendation that confiscatory character of rates be stipulated before entry of order.

Lane & Waterman, of Davenport, Iowa, and E. M. Warner, of Muscatine, Iowa, for plaintiff.
Ralph U. Thompson, of Muscatine, Iowa, for defendant.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

WADE, District Judge. [1] 1. I cannot do more at this time than to briefly record the conclusions which I have reached after the extensive and helpful arguments presented in these cases. Any attempt to review the wilderness of authorities cited, or to distinguish between apparently conflicting opinions of the courts, would be fruitless, even if I had the time.

Most of the cases at bar involve the question as to whether a specific provision in a franchise ordinance, fixing the price which shall be charged by the grantee of the franchise, is binding upon such grantee. It is not disputed that such provision is subject to modification by the city under its general power to "regulate and fix" rates.

It is earnestly contended that the power to "regulate and fix," excludes the power of the city to contract. This may be granted, so far as a contract binding on a city is concerned; but I cannot agree that there is any limitation upon the power of the city to "regulate and fix" by contract, as well as by ordinance or resolution.

It is a general rule, with relation to the exercise of power by a city, that—

"If the mode of exercise is not prescribed in the act or charter conferring the power, or in some other statute, the corporation may exercise the power in any usual and appropriate manner, according to its own discretion." 28 Cyc. 275, and authorities cited.

"This statute expressly confers on cities and towns the power to provide for the measuring or weighing of hay, coal, or any other article. The manner in which the power conferred shall be exercised is left to the discretion of the corporation, subject, however, to the general rule that the ordinance must be reasonable. The power given, in substance, is to regulate, and this implies that the corporation is empowered to do all things essential to the proper exercise of the power expressly conferred." Davis v. Town of Anita, 73 Iowa, 325, 35 N. W. 244.

In the state of Iowa a city is given the power to grant franchises without any limitation, except that such franchise shall not extend more than 25 years and that no exclusive franchise shall be granted. When this law was passed, it was, and still is, the well-settled rule that—

"When a municipal corporation has the power to grant or refuse, in its discretion, permission to a public service company to occupy the streets with its structures, whether such permission be called a franchise, a license, a permit, or a mere designation of the streets to be occupied, it may grant such permission, subject to such conditions as it sees fit to impose." 19 R. C. L. p. 1153, par. 427.

Of course, such conditions must not be against law or public policy. The city having the power to grant a franchise, the right to impose conditions is limited only by the terms of the grant of the power. Therefore it is self-evident that unless other legislation, and especially section 725 of the Code of Iowa, limits the power with reference to conditions to be imposed in granting franchise, a provision as to maximum rates would be binding.

Section 725 confers the power to "regulate and fix," but it does not specify how such power shall be exercised, and under the rule above stated it has the power to use its own discretion as to how such power shall be exercised. In Miller v. City of Webster City, 94 Iowa, 162, 62 N. W. 648, Judge Deemer says:

"As the statute expressly confers upon the city the authority to establish markets and to provide for the weighing of commodities, and contains no limitations upon the powers granted, the time, manner, and expediency of its exercise are left to the discretion of the corporation; and the judgment of its officers upon such matters cannot be controlled by the courts, so long as they act within the scope of their authority. The discretion of a municipal corporation, within the sphere of its powers, is as wide as that possessed by the government of the state, subject, however, to the general rule that the ordinances must be reasonable. The action of the city council in the exercise of expressly delegated powers cannot be questioned upon the ground that it is in conflict with public interests."

The term "regulation" is very broad. It is said that an ordinance "is not so comprehensive as a 'regulation,' and is more solemn and formal than a 'resolution.'" 28 Cyc. 348. Judge Shiras, in Kimball v. City of Cedar Rapids (C. C.) 100 Fed. 802, uses the words: "A contract regulating the rates to be charged by the company."

It ought to be a fair inference that, if the Legislature intended to limit the exercise of the power to "regulate and fix" to conditions expressed by ordinance, it would have so stated. We must always bear in mind, in dealing with municipal problems, that the powers of a municipality are not always exercised with formality, and I feel that this fact is kept in mind in the enactment of legislation for cities and towns.

Of course, any contract regulating rates must be in the nature of things "one-sided," so far as the rate is concerned. This is true because the city reserves to itself the power to change the rate at any time, subject only to the general rule that the new rate fixed must be reasonable. But I see no objections to a contract understandingly made which provides that the city shall charge a maximum rate, which shall continue until such period as the same becomes unreasonable, and that at such time the city reserves the right to modify the same.

Opposed to the foregoing views, counsel present strong reasons in public policy why the law should not be so construed. Of course, the matter of public policy can only be considered here, in an effort to construe the legislation. There are sound reasons in public policy why the city should not be allowed to bind the corporation by a contract for a rate which does not bind itself; but there are other opposing reasons in public policy, which to my mind overcome every suggestion in support of the contention of the utilities companies. It is a matter of common knowledge that franchises are frequently granted—sometimes after spirited competition, and often after bitter controversy, which franchises contain a definite provision that, during the term of the franchise, no more than a certain sum named shall be charged for public service. There can be no question that heretofore the people, voting upon franchises, have believed such conditions to be valid, and I must assume that utility companies, acquiring franchises containing such conditions, also assumed that such conditions were valid.

[2, 3] It is of the highest importance that the confidence of the people in the law, and especially in the sacredness of contracts, shall not be weakened. Every franchise and every power, under legislation, is construed most strongly against the grantee of a franchise. It is self-evident that to now hold that conditions relating to rates solemnly agreed to are without force would have a strong tendency to undermine

the confidence of the public in the law, and would have a tendency to put utility companies under suspicion of repudiating their obligations.

There is much force in the suggestion that regulation by contract should be permitted, especially with reference to smaller towns, which cannot well afford the investigation and the trial of the question of the reasonableness of rates from time to time, and I believe it would be in the interest of said communities to have a law permitting a contract binding both sides as to rates for reasonable periods of time, say three or five years. This would stabilize conditions for the utility company and the city or town, and avoid expensive and unpleasant controversies.

It is, of course, important that utility companies shall receive reasonable compensation for what is furnished. Upon the showing before the court (which for the trial of this issue I assume to be true) it is apparent that some of these companies cannot continue under the contract rates, because they have no source of income, except the money received for the commodity furnished, and war conditions have radically increased the cost of production, so that a rate fixed at the time a franchise was granted a few years ago may be utterly inadequate at the present time to pay even current expenses; but these are conditions which the court cannot relieve, as has been recently held in Columbus Co. v. City of Columbus (D. C.) 253 Fed. 499, and other cases.

[4, 5] 2. But there are other considerations. These cases are brought upon the claim that because the rates are confiscatory, the utility companies are deprived by the state of property without due process of law, and that they are denied the equal protection of the law. The Fourteenth Amendment to the Constitution of the United States provides:

"Nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The state (and the municipality, which is an arm of the state) shall not "deprive any person," etc. At the foundation of these cases is the problem as to whether, upon the facts, the state or the municipality has deprived the utility companies of property without due process, or whether the state or municipality is denying the "equal protection of its laws."

The courts are ever ready to enforce the provisions of the Constitution of the United States; but, in order to interfere with state or municipal legislation, it must appear that there is some affirmative act which constitutes the "deprivation," or the "denial," specified in article 14. When an ordinance is passed by a city council, under authority of the state, it is an act of the state, and if it deprives one of his property without due process, or denies equal protection, the act will be enjoined, for the Constitution is sacred, and must under all circumstances be upheld.

But has the state, or the municipality, in these cases, done any act which violates the Constitution, except in so far as such act has been consented to by the companies? It is fundamental that every individual constitutional right may be waived.

"A person may, by his acts or omission to act, waive a right which he may otherwise have under the provisions of a Constitution; and where such acts or omissions have intervened, a law will be sustained which otherwise might have been held invalid, if the party making the objection had not by prior acts precluded himself from being heard in opposition. Thus a person who has participated in proceedings under a statute, or who has acted under the statute and in pursuance of the authority conferred by it, or who has claimed the benefit of the statute to the detriment of others, or who asserts rights under it, may not question its constitutionality." 12 Corpus Juris, p. 769, § 190 et seq., and cases cited.

Even in criminal cases:

"Those constitutional guaranties, which are in the nature of personal privileges of the accused, may be waived by him, and therefore he may not question the constitutionality of a statute under which he has made such a waiver." 12 Corpus Juris, 774, § 203.

It must be apparent that if the confiscatory rate is fixed, not by the municipality, but by the utility company, the state has done no act "depriving" the company of its constitutional rights. It must likewise be apparent that if the rate is the joint act of the utility company and the city, if the utility company has consented to the rate, that it has waived the constitutional right which it might otherwise assert, and I am convinced that if a rate is fixed by agreement of the utility company, which at the time is a reasonable rate, but which thereafter becomes confiscatory, without any act of the state, but simply as a result of industrial conditions, that the prohibition of the Fourteenth Amendment upon the state is not violated by the state.

This is serious business, restraining the sovereign act of a state. There is no constitutional guaranty of compensatory rates. So far as income and profits are concerned, the utility corporation stands exactly in the same position as the building corporation, or the street improvement company. It may make money—it may lose money; but only when the state has acted affirmatively, to the deprivation of reasonable income upon actual investment, can constitutional guaranty be invoked; and where the utility company consents to the act of the state, there is not that "deprivation" or "denial" which the Constitution forbids. So that I am satisfied that the utility companies are bound by these contracts.

I realize, of course, the hardship which this construction imposes. I realize that it is inequitable to expect a utility company to furnish service which cannot be paid for out of the income. It may not be here inappropriate to quote from the opinion in the Columbus Railway Case, supra:

"It cannot be denied, on the showing made, that the present war has greatly increased the cost of street railway operation. The award of the National War Labor Board in the wage controversy cannot be regarded otherwise than binding on the company, and the increase of wages granted by the company pursuant thereto cannot, in any fair sense, be considered as its voluntary act. It is also undoubtedly true, on the showing made, that complainant cannot, under existing conditions finance any improvements required to meet new demands for heat, light, and power, or for increased street railway facilities, and its failure so to do must injure the interests of the defendant and its inhabitants as much as it injures the complainant.

"Prolonged operation under these conditions would seem to be a manifest impossibility, and must result in impairing the street railway service

and grievously harming the people and business of the city. These considerations do not, for the reasons already stated, present any ground upon which a court can grant relief, for it has power only to declare the law and apply it. A sound public policy forbids usurpation by the courts of governmental power lodged in other departments of the government. No power inheres in a court, either to make contracts for parties, or to absolve them from the effect of their contracts, provided the parties are competent in law to contract, and no fraud intervenes in the making thereof. In view of these well-recognized limitations of the court's power, I can only suggest that the present emergency, likely as it is to become much graver in the near future, calls urgently for some kind of accommodation or temporary compromise between the parties."

Much of the controversy in these cases arises out of a misunderstanding between the utility companies and the people of the communities which they serve. There ought not to be any misunderstanding. The public should interest themselves sufficiently to understand definitely the viewpoint of the company, and it is not too much to hope that in these cases, where existing contracts, by virtue of war conditions, imposed grave hardships, that temporary arrangements may be made by which the situation may be solved for the time being.

### The Record in These Cases.

These cases have been set down for trial by order of the court, upon the issue as to the validity of the contracts. I am not sure that the record is in shape to present this issue appropriate for review in the higher court. Of course, I have assumed, and counsel have assumed, for the sake of this question, that the contract rates are confiscatory; but I am not sure that the record justifies this assumption.

To save any possible question, in the interest of all parties, it ought to be admitted of record, for the purpose of this hearing, that the contract rates in each individual case are confiscatory. So important is this in my present view that I feel that it would be necessary to take testimony upon this point, unless it is handled by a stipulation.

I therefore suggest that counsel for the plaintiffs in these cases prepare a stipulation which they feel will make the record, and submit it to counsel for the company, and by mutual co-operation I am satisfied that, without waiving anybody else's rights, the record can be completed. In this way the matter can be presented to a higher court without much expense, and with more satisfaction in the consideration of the question involved.

After this is done, the court will enter an order of record, and will at that time hear counsel for the plaintiffs upon their request for a continuance of the restraining order pending appeal. Application for such continuance to be prepared and served upon counsel, as the rules of this court provide.