### COLORADO POWER CO. v. HALDERMAN et al.

(District Court, D. Colorado. January 4, 1924.)

#### No. 7473.

1. **Constitutional law ⬥48—Constitutionality presumed.**
    Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a reasonable doubt.
2. **Courts ⬥366(1)—State Supreme Court's construction of state statute binding.**
    The decision of the highest state court on the proper construction of a state statute is binding on the federal courts.
3. **Constitutional law ⬥46(3)—Where constitutionality of statute depends on its construction, constitutionality not determined in federal court in advance of construction by state court.**
    Colorado Public Utilities Act, in view of section 52 thereof, being susceptible of a construction rendering the act, as respects the requirement of due process of law, constitutional, as providing independent judicial review of the commission's orders, the question of the unconstitutionality of the act on that ground cannot be raised in the federal court by a utility, complaining of an order of the commission as to its rates, until the utility has raised the question in the state court, or unless decisions of the highest state court have construed the act as to the extent of judicial review afforded thereby.
4. **Public service commissions ⬥7—Fair value of utility may be more than its cost, and value determined as of time when inquiry made as to rates.**
    As respects rates of a public utility, the making of a just return for the use of the property involves the recognition of its fair value, if it be more than its cost, and the value of the property is to be determined as of the time when the inquiry is made regarding the rates.
5. **Electricity ⬥11—Supplementary plant held properly included for rate valuation purposes.**
    Where electric company's plant at S. produced a variable amount of electrical energy, because the plant had no dam and used the direct flow of the river, the company *held* entitled to have included as a necessary part of its system for rate valuation·purposes, its plant at B., which, be-

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cause of having a reservoir, could be used, not only to supplement the plant at S. at times of low water, but also in case of breakdowns of plant or transmission lines.

6. **Electricity** ⬳11—**Small unnecessary plants held not properly included in system for rate valuation purposes.**

As respects fairness of rates for electricity, *held*, that certain small and inefficient plants of an electrical company, operated occasionally as reserve plants, were not proper to be included in the company's system for valuation purposes.

7. **Electricity** ⬳11—**Load of wholesale consumers held not to be excluded, in determining useful part of system for rate valuation purposes.**

As respects fairness of a company's rates for electricity, *held*, that it was not proper to exclude the load of three wholesale consumers, consuming 60 per cent. of the company's total production of electricity, in determining what were the used and useful parts of the company's system.

8. **Electricity** ⬳11—**Inventory held competent evidence of present day value for rate purposes.**

An inventory of an electrical company's system, while not purporting to show the present day fair value thereof, *held* competent and valuable evidence of such value for rate purposes.

9. **Electricity** ⬳11—**Marketing securities held improper item for rate valuation.**

As respects valuation of an electrical company's system to determine fairness of rates, a valuation claimed for marketing of securities *held* not a proper item.

10. **Electricity** ⬳11—**Electrical company held not a public utility as respects wholesale customers, retailing light and power and operating street railroads.**

An electrical company *held* not a public utility as to its wholesale customers, which used such power under special contracts to operate street cars and to retail it for light and power, as their contracts did not necessarily affect the general public.

11. **Corporations** ⬳382½—**That rate fixed by contract is too low is immaterial.**

Where a rate is fixed by a binding contract, a public utility cannot complain, and the question of whether the rate is too low to give a reasonable return is immaterial.

12. **Electricity** ⬳11—**Evidence held to show undervaluation for rate purposes.**

In power company's suit to enjoin enforcement of Colorado Public Utilities Commission's order respecting the company's rates, evidence *held* to show an undervaluation by the commission of the plaintiff's plant, entitling plaintiff to injunction.

In Equity. Suit by the Colorado Power Company against Grant E. Halderman and others. Injunction granted.

William V. Hodges, James Grafton Rogers and D. Edgar Wilson, all of Denver, Colo., for plaintiff.

Barney L. Whatley, of Denver, Colo., for defendants.

SYMES, District Judge. The Colorado Power Company was incorporated in Colorado in 1913, and is the successor through reorganization of all the property and assets of the Central Colorado Power Company and the Leadville Light & Power Company. Since its incorporation it has acquired the Georgetown hydro plant, hereinafter referred to, and other isolated properties not part of its so-called central system. The plaintiff and its said predecessors will be referred to as the power company. Three of the defendants constitute the Public Utilities Commission of Colorado, and the fourth is the Attorney General—all made defendants in their official capacities. The power com-

pany is the owner and operator of several plants generating and selling electrical energy. This suit concerns only that part of its properties known as the central system, which, it is admitted by all parties, constitutes a separate operating entity. The two or three isolated plants owned by the power company have been disregarded by both sides in this proceeding.

The central system consists of a large hydro-electric development at Shoshone, on the Colorado river just above Glenwood Springs; a hydro development of considerable size on Middle Boulder creek above Boulder; a small hydro-electric plant at Georgetown; and an old steam plant at Leadville—all in Colorado. These plants are all connected by a transmission line with substations at Leadville, Dillon, Idaho Springs, and a so-called Denver substation located just outside the city limits of Denver. It supplies energy from this system to a large territory, all within the state, and has a diversified market for its product. A portion of its energy is used for power purposes in the mining districts of Colorado accessible to its lines and the lighting of many small mining towns. It wholesales a large proportion of its product to other public utilities, two serving the city of Denver and another a considerable territory adjacent thereto on the north, and one or two very small utilities in the western part of the state. More detailed facts concerning its properties and history will be developed in the opinion.

In 1913 the Legislature of the state passed a comprehensive public utility act, creating a board of three commissioners, defining their powers, and making all public utilities, including electrical corporations, such as the plaintiff, subject to its control and regulation. The state Supreme Court has held that the commission does not have jurisdiction over utilities operating in the larger so-called "home rule" cities. The plaintiff, however, does not operate in any of these cities, except as a wholesaler to the local utilities. The plaintiff was doing business, and had entered into certain agreements for the disposal of part of its product at agreed or contract rates before the passage of the act. In December, 1919, the power company filed with the commission certain schedules and increases it proposed or requested to be allowed to make in power rates, and also special agreements with certain specified consumers, and cancellations of special power agreements with other consumers. In January, 1920, the commission ordered applicant to make for the commission, under the direction and supervision of its engineer, a full and complete inventory and appraisal, as of January 1, 1920, of the physical properties of the company located within the state, and, further, the company to place its books, records, and accounts at the disposal of the commission's statistician for the purpose of enabling it to arrive at a full and fair valuation of the power company's property. Later, in October the same year, the power company filed a supplemental application with schedules attached thereto, including the power rates above mentioned, asking for further increases in power rates.

Numerous protests were filed with the commission by consumers affected. Again, and on November 10, 1920, the power company filed new schedules, containing summaries of special power agreements and

proposed cancellations of special rates, which placed before the commission substantially its entire rate structure as it then existed, together with proposed increases and cancellations of certain contracts. In effect it asked for an increase of 40 per cent. in certain power schedules known as 11 and 12, 20 per cent. increase, with some exceptions, in certain special power agreements, and permission to cancel certain special agreements, which would require the consumers named therein to pay scheduled rates. By various orders of the commission the proposed increases and cancellations were suspended from time to time, and finally, by mutual agreement by all the parties, until the final decision was rendered.

In November, 1920, the power company filed a full and complete inventory and appraisal as ordered, and in December, 1920, asked permission to temporarily increase its rates as an emergency measure until final hearing. This was denied. All of the applications and protests were consolidated, considered at one hearing, and all parties in interest were given an opportunity to be fully heard. In April, 1922, the commission handed down its opinion, in which it discussed the issues raised, and made its order permanently suspending the proposed increases, in effect denying the power company any of the relief asked for. The commission found that:

"(44) The net investment upon which the applicant is entitled to earn a fair rate from firm power customers is found to be * * * $3,736,965."

To this net investment, it added for working capital necessary for firm power consumers, $184,495 and $300,000 as a reasonable allowance for going concern value, making a total of $4,211,460 as the fair valuation of—

"so much of applicant's property as is reasonably necessary for the service of all the customers on the central system (and excluding the Denver Gas & Electric Light, the Denver Tramway, and the Western Light & Power Companies)."

They further found that the balance of the property known as the central system is the result of an overbuilt plant, and is not in use or useful in serving the customers on the central system, excluding the above-named companies. The opinion discusses the operating expenses for the whole central system, and allocated a certain portion of them in proportion to that part of the system that it found used and useful, and found that the net revenue, after depreciation upon this rate base, was $365,323, and as this amount gave more than an 8 per cent. return on the rate base they came—

"to the conclusion that the rates charged the customers on which this earning was obtained were amply sufficient and high enough to afford the company a reasonable return on the capital invested."

The commission states that this rate base was arrived at by a segregation and value of that part of the properties comprising the central system in use and useful in serving all of the customers on the central system outside of the Denver Gas & Electric Light Company, the Denver Tramway Company, and the Western Light & Power Company.

This allocation included the value of certain parts of the system as a whole, to wit, the Shoshone, Georgetown, and Leadville plants, excluded certain other units as a whole, such as Boulder, and in allocating on the basis of relative traffic or use, the value of the transmission lines and other properties, as between firm power use and the total use.

The plaintiff thereafter filed its bill in this court, complaining of the action of the Public Utilities Commission as here set forth, and asked that the acts of the commission in denying any increase in, rates be declared unconstitutional, null, and void; that any further action, or threatened action, on the part of the defendants, be enjoined; that the Public Utilities Act be held unconstitutional, in so far as it affects the right of the plaintiff to charge its proposed increase in rates; and that the defendants and all the consumers and users of electric energy from the central system be restrained from enforcing in any way the order of the commission, or from interfering with the plaintiff or from taking any action against the plaintiff on account of its failure or refusal to conform to the rates prescribed by the commission. In short, this court is called upon to decide whether any of the plaintiff's rights or guaranties under the federal Constitution have been violated by the order of the commission. The case was tried to the court, and took four weeks for the testimony. The record is very voluminous, consisting of testimony of the officials, numerous experts on both sides, many lengthy and varied exhibits, and several depositions.

I. The plaintiff contends that, regardless of anything else, the order is unconstitutional, because the Colorado Public Utilities Act does not provide for an independent judicial review of the commission's orders. The answer to this question depends upon the construction of section 52 of the act (section 2961, Comp. Laws of 1921). It provides that any party aggrieved by a decision of the commission may, within 30 days thereafter, apply to the Supreme Court of the state for a writ of review. No new or additional evidence may be introduced in the Supreme Court, but the case shall be heard on the record made before the commission, as certified by it. This record, according to section 46 of the act (section 2955, Comp. Laws), consists of a full and complete record of all proceedings had before the commission, a full transcript of the testimony, together with all exhibits introduced, and all information secured by the commission on its own initiative and considered by it in rendering its order or decision, together with the pleadings. Section 52, supra, continues:

"The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Colorado, * * * and whether its conclusions are in accordance with the evidence."

If this was all, there would be nothing to the question raised, as this language clearly complies with the rule announced in Ohio Valley Co. v. Ben Avon Borough, 253 U. S. 287, 40 Sup. Ct. 527, 64 L. Ed. 908. The section continues, however:

"The findings and conclusions of the commission on disputed questions of fact shall be final and shall not be subject to review."

This language, standing alone, would violate the rule laid down in the Ben Avon Case, supra, to wit: That the state must provide a fair opportunity for submitting that issue to a judicial tribunal empowered to exercise its own independent judgment as to both law and fact. Otherwise, it is there held, denial of due process of law results.

[1] It appears, therefore, that on a review the highest court of the state has before it a complete transcript of all the evidence and everything considered by the commission in making its decision. It is specifically empowered to determine the only question that can be raised in this court, to wit, whether the commission has, by the order complained of, violated any right or protection given an appellant by the federal Constitution, and whether the conclusion of the commission is in accordance with the evidence. It is true that the language immediately following that which I have quoted above throws doubt upon what is meant by the provisions I have referred to, but the whole section must be construed together, and not according to any single sentence or paragraph. We must also bear in mind the rule that:

"Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt." Sinking Fund Cases, 99 U. S. 700, 718, 25 L. Ed. 496.

In Bratton v. Chandler, 260 U. S. 110, at page 114, 43 Sup. Ct. 43, at page 44 (67 L. Ed. 157), it is said:

" 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.' "

See, also, Arkansas Gas Co. v. Railroad Comm., 261 U. S. 379, 43 Sup. Ct. 387, 67 L. Ed. 705, and 12 Corpus Juris, 791–794.

[2] Section 67 of the Public Utility Act of California (Ex. Sess. 1911, p. 18) is very similar to the section of the Colorado statute attacked here in respect to reviews by the Supreme Court of the state. That statute and these particular questions were discussed in Napa Valley Co. v. R. R. Comm., 251 U. S. 366, at pages 370, 371, 40 Sup. Ct. 174, 64 L. Ed. 310, but the case was decided on another point. The question is one involving the construction of a state statute, and the decision of the highest state court is binding on this and other federal courts. Georgia Ry. & Power Co. v. Decatur (June 4, 1923) 262 U. S. 432, 43 Sup. Ct. 613, 67 L. Ed. 1065, and cases cited. It would therefore seem that the rule in the Ben Avon Case has not been violated, unless decisions of the highest state court construing the act do so.

The plaintiff contends that this has been done in A., T. & S. F. Co. v. Public Utilities Commission, 68 Colo. 92, 188 Pac. 747. That case involved only the reasonableness of certain switching charges, and the contention of the railroads was that there was no evidence to support the commission's findings. The court held that there was evidence to support the findings of the commission, and says in the syllabus:

"The Supreme Court is authorized to set aside or modify the order of the commission, if not supported by the evidence, but not to revise findings of fact upon conflicting evidence."

It is hard to say whether the court meant it has the power to substitute its independent judgment for that of the commission or not. In

a proper case the court might hold it could set aside an order of the commission as "not supported" by the evidence, even if there was some conflict. The same court in D. & S. L. R. R. Co. v. C., B. & Q. R. Co., 64 Colo. 229, 171 Pac. 74, used similar language, and asserted its right to consider the evidence, and ascertain from it whether the commission's conclusions are in accordance with the evidence. Our question was not directly involved. The court reversed the commission, because there was no evidence at all to support the 'order.

[3] Is not the plaintiff really asserting here what it believes the state Supreme Court would have decided, had it appealed directly to that court from the order of the commission? It has not actually tested that court on what is, at the best, from its point of view, a very close question. It has not done what the plaintiff did in the Ben Avon Case, supra, to wit, exhausted all remedies given by the state statute before appealing to the federal court, so it is not in as good a position. It does not, and cannot, say where or how the alleged unconstitutional feature of the act has as yet actually injured it, or deprived it of any right that this court is empowered to protect. It was said in Mountain Timber Co. v. Washington, 243 U. S. 219, at page 237, 37 Sup. Ct. 260, at page 264 (61 L. Ed. 685, Ann. Cas. 1917D, 642):

"The question whether a state law deprives a party of rights secured by the federal Constitution depends, not upon how it is characterized, but upon its practical operation and effect."

The Supreme Court is given the power by the statute (section 52, supra) to enter judgment either affirming, setting aside, or modifying the order or decision of the commission. Therefore the line of decisions headed by Prentis v. Atlantic Coast Line, 211 U. S. 210–229, 29 Sup. Ct. 67, 53 L. Ed. 150, are in point, as distinguished from the later case of Bacon v. Rutland Railroad, 232 U. S. 134, at page 137, 34 Sup. Ct. 283, 58 L. Ed. 538. The Prentis Case involved a matter of rates fixed by a state commission. The court held that the dissatisfied railroads should appeal to their state court before filing their bill in the federal court.

In the Bluefield Case (June 11, 1923) 262 U. S. 679, 43 Sup. Ct. 675, 67 L. Ed. 1176, the Ben Avon Case was affirmed, but in both the complainant had exhausted its remedies in the state courts before taking the question to the federal courts. In Oklahoma Natural Gas Co. v. Corporation Commission of Oklahoma, 261 U. S. 290, 43 Sup. Ct. 353, 67 L. Ed. 659, this same question was involved. The statute gave an appeal from the commission to the Supreme Court of the state, acting in a legislative capacity, with power to substitute a different order, and to grant a supersedeas in the meantime. An appeal had been taken, supersedeas applied for and refused, and the appeal not decided, when the gas company went into the federal court. The court held they were properly in the federal court because, as stated (261 U. S. 293, 43 Sup. Ct. 354, 67 L. Ed. 659), "they have done all that they can under the state law to get relief and cannot get it." And on this ground the court distinguished Prentis v. Atlantic Coast Line, supra.

I conclude, therefore, that section 52 of the statute is constitutional in so far as it affects this case.

[4] II. We now come to the only federal question left. Is the plaintiff, if compelled to obey the order of the commission, deprived of a fair return upon the present-day fair value of its property that is used and useful in the public service? Willcox v. Cons. Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; S. W. Bell Telephone Co. v. Public Service Commission of Missouri, 262 U. S. 276, 43 Sup. Ct. 544, 67 L. Ed. 981, May 21, 1923. In deciding this question we bear in mind the rule, among others, of the Bell Telephone Case, supra, that "the making of a just return for the use of the property involves the recognition of its fair value, if it be more than its cost," and statement in the Consolidated Gas Case, supra, that "the value of the property is to be determined as of the time when the inquiry is made regarding the rates." It is also said in Bluefield Waterworks & Improvement Co. v. Public Service Comm. of West Virginia (June 11, 1923), 262 U. S. 678, 43 Sup. Ct. 675, 67 L. Ed. 1176:

"The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts."

[5] The commission has decided that only a part of the so-called central system of the power company is used and useful for the public service, and entirely eliminated the balance for valuation and ratemaking purposes. This court must therefore determine, first, whether this finding is correct, and, if not, what property of the plaintiff is used and useful in the public service; and, secondly, its value.

The Shoshone development is located in the cañon of the Colorado river, near Glenwood Springs, in the western part of the state, separated from its principal market by the Rocky Mountains. It uses the direct flow of the river by means of a tunnel 2¼ miles long, of sufficient length to give it a head. The amount of electrical energy developed at this plant varies directly with the flow of the stream, as there is no reservoir or other means of regulating the flow. Like all Colorado streams, there is a great variation in its flow between winter and summer; the average during the six low months (November to March) being about 880 cubic feet per second of time, while the flow in the summer is so much larger that the average for a normal year is 3,047 cubic feet per second of time. The water rights of the company are ample, and the installed generating capacity exceeds the water capacity at times of low water.

Relying upon this plant alone, the company would necessarily be limited in making firm contracts for service throughout the year by the amount of power produced during the low-water season. This is called its possible firm commitment. There is, however, sufficient generating capacity, or machinery, to greatly increase the production of electrical energy during the high-water months. The power company can sell this excess electricity as, and when, the water supply permits, but cannot use it as a basis for firm commitment for the entire year. This excess, or by-product, may be properly called "dump" power.

At about the time of the construction of this plant, and as a part of its project as a whole, the power company built the Boulder plant,

located a few miles above Boulder, on Middle Boulder creek, on the eastern slope of the Rocky Mountains, and separated from the Shoshone plant by the main range. This development includes a large reservoir, known as Barker dam, connected by a high-pressure pipe line with a generating plant located a few miles down the creek. The big fall in the stream between the dam and the generating plant gives a very high water pressure, and produces a much larger output of electricity per unit of water than at Shoshone, with the valuable added advantage of regulation and control of water supply afforded by the reservoir.

The flow of the Colorado river at the Shoshone plant is the largest of any stream in the state, but is variable and unregulated. The Boulder stream flow is small compared to the Colorado river, but this regulation enables the power company to use the water when wanted. The main transmission line, crossing the Rocky Mountains at two or three points at very high elevations, connects the two plants, and runs to the city limits of Denver. There are secondary transmission lines connecting the Leadville plant, the Georgetown plant, and the mining districts located adjacent thereto.

It is clearly demonstrated that the Shoshone and Boulder developments complement each other, in that the large, but unregulated, production of energy at Shoshone is regulated and averaged up by bringing the Boulder plant into use during times of low water at Shoshone. To illustrate: A platted curve showing the maximum possible production of energy at Shoshone for the period of any year would show great fluctuations, due to this wide variation in water supply. By accumulating water in the dam at Boulder in the summer during the time of high water at Shoshone, and using it during the winter months, when the water flow at Shoshone is low, the valleys in the Shoshone production curve can be filled up to a large extent, so that the minimum amount of electrical energy capable of firm power commitment that the power company can safely contract for, or guarantee to supply its customers day in and day out throughout the year, is very much larger than that of the Shoshone plant alone, or the total of the two plants, if operated as wholly separate units. In other words, the Boulder plant serves Shoshone in the same manner as a large reservoir located on the Colorado river would.

Granting this to be true, however, the defendants' experts contend that the central system is greatly overbuilt, and that the Shoshone plant, in connection with the small Georgetown hydro and the Leadville steam plant, is capable of supplying the demands of what the plaintiff calls its firm power load; that is, all its business, excluding the loads of the Denver Gas & Electric Light Company, the Denver Tramway Company, and the Western Light & Power Company. The testimony of Mr. Dwight and Mr. Flower, electric experts of the commission, is to the effect that Shoshone and Georgetown hydro, with Leadville as an emergency standby, can produce enough energy to just about take care of the demonstrated firm power demand, without anything left over, so that, in their opinion, the Boulder development is not justified as a necessary or useful part of the central system. They admit, however, in explaining their exhibits, that there have been in the past one

or two occasions when this could not have been done, and that at many other times such a combination, as they express it, "would be hard put to do it." They further state that such a combination would require some regulation or small reservoir capacity at Shoshone, which they say is afforded by the small diversion dam located at the intake of the tunnel, and that even then it would be a very close question. The evidence clearly shows, however, that the amount of water this diversion dam is capable of impounding in the river at Shoshone is so small that it cannot be used for the purpose of increasing the firm power commitment of the Shoshone plant up to what they say it should be to justify their position.

But, granting for the moment their premise is true, it does not prove their contention, for it entirely loses sight of the question of dependable service to the public. This factor has to be considered, as well as the actual or theoretical amount of energy available from the suggested combination of plants. The question of service invites attention to the fact that the Shoshone plant cannot consistently produce as a practical operating proposition their estimated theoretical low water production of energy day in and day out. The Shoshone tunnel, running 2¼ miles through a loose rock formation, requires occasional shutdowns, either partial or complete, due to the collection of débris and falling rock and inspection. Repairs are necessarily required from time to time by each of the two generating units. In addition, there are inevitable breaks and interruptions in the transmission line, crossing the Rocky Mountain range at very high elevations, sensitive to adverse weather conditions, winter storms, snow slides, and other unavoidable causes before it reaches its larger market.

The service afforded by the Shoshone and Boulder plants, feeding in at each end of the transmission line, is very practical and efficient. A shutdown at either plant, due to unavoidable causes or necessary repairs, does not interrupt service, as either plant can carry the overload temporarily, and the effect of a break in the transmission line can thus be very largely localized. It is demonstrated that uninterrupted service is an important factor in obtaining and holding customers on this system. Many mining customers would go back to steam power in preference to electricity, if subjected to the threat of flooding of their shafts and workings that follows an interruption of service. There would also be danger to the life and limb of employees working underground, if the machinery stopped. Frequent failure in service to a smelting company while engaged in metallurgical processes would inevitably cause great damage, and render the use of the plaintiff's energy by them impractical, as would unreliable supply of power to the Denver street cars under the Tramway contract, or the Denver Gas & Electric Light Company for lighting and power purposes in a large modern city.

The power company should also provide, and have taken into account in this discussion, a reasonable amount of surplus generating capacity to supply the possible increasing demands of its present customers and the requirements of new ones. This is important, if adequate service is to be given the public. The record shows that the

mining industry during the period covered by the evidence has been at a low point, but is now on the upgrade of activity and production. Under the theory of the Public Utility Act the power company may be required to do this, or allow a competing plant to enter the field. In short, the conditions under which the plaintiff necessarily operates, and the market it supplies, cannot be satisfied by the use of that part of its plant designated by the Public Utilities Commission as sufficient. The inevitable result would be that its customers would go elsewhere for power, or rightly demand of the commission the compelling of better service.

[6] The Georgetown hydro plant was purchased after the construction of the Shoshone and Boulder plants, and can supply only a very small amount of energy—350 K. W. It is not modern in operating efficiency or cost. The Leadville plant is obsolete and antiquated, evidently purchased to get rid of a competitor, and to secure contracts for the business of certain large customers in the Leadville mining district, that required the maintenance of the Leadville plant for standby service. As the court has already found that the Shoshone-Boulder combination insures practically continuous service, this plant cannot be justified on that ground. The power company has never operated it continuously, but only as a standby plant for emergencies and at very great expense, due to its poor location, high price of coal, and high operating costs. These plants, poorly located and inefficient, do not duplicate, and cannot take the place of, Boulder in any well co-ordinated, efficient, modern system. Their small capacity is not needed. Neither is necessary or useful in serving the public in connection with Boulder and Shoshone in combination.

[7] The defendants contend, and the evidence clearly demonstrates, that over 60 per cent. of the total energy generated by the power company is wholesaled to the Denver Gas & Electric Light Company, the Denver Tramway Company, and the Western Light & Power Company. Yet the defendant commission has excluded the load of these three consumers in determining what are the used and useful parts of the plant.

Laying aside for the moment the important question whether the contract rates paid by them are discriminatory, no serious objection is made by the defendants to the arrangement. The power company very earnestly contended before the commission, as it does here, that most of this energy is what is known as dump power, because it is in part manufactured from excess water during the high-water season of each year, over and above the low-water average, and therefore cannot be made the subject of firm commitment. It also says that the energy supplied under these contracts can be taken away at any time the power company sees fit to do so, and that it is to a large extent supplied only during "off the peak" periods. But the testimony satisfactorily proves that it is not dump power within the well-defined meaning of the term. The Denver Gas & Electric Light Company alone has always taken roughly 50 per cent. of the total output, irrespective of high or low water seasons, and takes it when it needs it, the same as any other consumer, and does not stay off of the peak demand, but as

a matter of fact its load contributes to the peak of the power company. The Tramway contract is a firm commitment by its terms, as later shown herein. The Western Light & Power is part firm, and like the other two it has always received a regular supply of energy from the power company, as their several demands required.

The provisions in the several contracts mentioned, relied upon to demonstrate that this is dump power service, are immaterial, because they have never been availed of, and the practical working out thereof demonstrates they are regular customers, as far as the characteristics of their load factor and service is considered. This is the finding of the commission. There is therefore no reason for excluding their requirements in determining the size and capacity of the plant necessary to supply the power company customers and the value thereof.

It is not, and could not be, successfully contended that the Shoshone-Georgetown-Leadville combination could supply all the electricity sold by the power company, including that sold to these utilities. With this load included, the plant is not an overbuilt one, and the commission so found. Exhibit K, p. 42. The testimony of the plaintiff on this point is that the entire plant is necessary to supply all its customers, and while the evidence of the defendants raises a doubt upon this, it does not justify any finding that the system is overbuilt, in the sense that there was no justification for its construction.

I therefore find that the Shoshone and Boulder plants, together with the transmission lines and substations, and excluding the Georgetown and Leadville plants, are used and useful in the public service, and their fair value must be determined in arriving at the rate base that the plaintiff is entitled to a fair return on.

[6] On the question of valuation, the plaintiff presents an inventory and appraisal of the so-called central system (Plaintiff's Exhibit F), made by George H. Throop, a competent electrical engineer, experienced in valuation work, and an officer of the J. G. White Engineering Corporation of New York City. This was examined and verified by other experts, and is supported from various angles by other exhibits. Exhibit F lists in great detail, item by item, all the property that makes up the central system. It is exhaustive to the extent of listing and valuing such items as window ventilators, dictionaries, glass tops for office desks, tables, hat and coat stands, spittoons and the mats on which they stand, together with check protectors, dictaphones, postal scales, a holder for wrapping paper, and other items of a similar character, evidently assumed by the witness to be used and useful in the manufacture of electrical energy from water. According to his testimony Exhibit F shows—

"what it would have cost the Colorado Power Company, or any other company, or any contractor, to procure and construct the properties embraced in the central system as it existed on June 1, 1920, according to prices and costs prevailing on June 1, 1922—the total of such estimated cost being $11,189,800."

This figure does not take into account depreciation, interest during construction, going concern value, and, with few exceptions, the value of the water rights in the Shoshone and Georgetown developments, etc. It does not purport to show the present-day fair value, but under

the authorities is competent and valuable evidence of that.   Denver v. Denver U. W. Co., 246 U. S. 178, 38 Sup. Ct. 278, 62 L. Ed. 649; Bluefield Waterworks Co. v. Public Service Comm. of West Virginia, 262 U. S. 679, 43 Sup. Ct. 675, 67 L. Ed. 1176.

This witness first became acquainted with the properties in 1920, when called upon to make the valuation, and took as his basis the so-called Walbridge analysis (Exhibit C), and only viewed the property in part.  This is a record, or listing, of all items of labor, material, and expenditures made, according to a cost and accounting system installed after the work had started.  It sets forth all actual material, labor, expenditures, etc., actually incurred, whether necessary or not, with few exceptions.  It therefore includes the cost of the mistakes hereafter referred to, and the admittedly excessive costs of part of the construction at Shoshone, due according to witnesses of the plaintiff, to unusual and unforeseen difficulties.  These unusual conditions were the extreme low temperature experienced during the winter, when the diversion dam at the head of the tunnel was constructed, the fact that it was built in the bottom of a canon difficult of access, failure of a trust company acting as depository, and other alleged unforeseen and unusual conditions encountered, such as the treacherous and unknown character of the river bed, poor labor available, etc.

The testimony on this part of the case is mostly that of the plaintiff's witnesses.  It appears that in the building of this diversion dam great trouble was experienced in temporarily diverting the water of the stream while the dam could be put in.  At least four or five different methods of doing this were tried, and each in turn abandoned, after a considerable expenditure, in favor of a new one.  According to one witness the unit cost prices of the work done on this dam were three or four times those usually experienced.  The first estimate of its cost was $40,000.  Others testified that it actually cost 10 times that. This also applies to the tunnel in a lesser degree, the cost of which exceeded any of the preliminary estimates.  The labor costs were excessive, due to the poor class of laborers available, and frequent turnover, an entire change of force occurring on an average every three weeks.

Many of these problems, such as the weather, inaccessibility, and labor, to some extent, could have been reasonably anticipated before beginning the work; for, as one qualified witness testified, these are the problems that the construction of hydro plants generally present— that is, they are necessarily constructed under adverse conditions, and the site, and its physical surroundings cannot be selected with a view to ideal construction conditions.  A careful reading of all the testimony convinces the layman of the truth of the statement of one of plaintiff's witnesses, that some of the excessive costs, at least, could have been anticipated and guarded against, and therefore would not be necessary, if the work was reproduced.  There is no evidence showing a thorough preliminary examination of the site, or how careful or adequate a study of these problems was made before actual work began. I do not believe that the excessive expenditures on the dam—admittedly exceeding those experienced by the witnesses on any other jobs of great-

er or less magnitude—the failure to provide a temporary power plant of sufficient capacity, etc., can be wholly justified as necessary.

It is true that great ingenuity was shown in switching from one plan to another. This was due, however, to failure to properly ascertain beforehand the structure of the bed of the stream. This dam is not a large one, and not designed to impound any amount of water; its function being simply to divert the water into the tunnel without in any other way regulating or holding back the flow. Large expenditures are claimed in Exhibit F on account of administration, legal, and engineering costs. These are divided among the Shoshone, Denver, Boulder, and other districts, and the engineering is further divided among these several accounts under "Head office," "Engineering," and "Local Engineering." The totals claimed are for—

| | |
|---|---|
| Administration | $324,700 |
| Legal | 123,100 |
| Engineering | 105,400 |
| Local engineering | 230,000 |

Additional sums for similar items appear elsewhere in Exhibit F. No evidence is offered as to the necessity for such large expenditures for these accounts, except that of Mr. Throop and other witnesses, who, many years later, find them on the books and state as their conclusion that they are proper.

Plaintiff claims a valuation of $600,000 for the value of the Shoshone water rights, based on the evidence of the civil engineer. This item is not supported by any other competent evidence, and I am of the opinion that it is high.

[9] A valuation is also claimed for "marketing of securities." This is not a proper item. City of Minneapolis v. Rand (C. C. A.) 285 Fed. 818. Mr. Throop testified that the unit prices he used were of June 1, 1922, and are 36 per cent. higher than the historical cost of the work. This is a reduction from an excess of 90 per cent. over the historical cost existing in 1920, when he first made his valuation. This is justified and there has been no reduction in unit prices since that time.

The elimination of the Leadville and Georgetown plants from the valuation requires the segregation and deduction of all items of "Leadville District" and "Idaho Springs District," Exhibit F, that belong to the generating units, as distinguished from valuation items that are required for the service of consumers in those districts, with the generating plants eliminated. I have taken out the following items from "Leadville District:" That part of account 105 represented by items $980, $29,662; account 106, $6,718, $2,744, $3,473, $4,895, $20,974; account 107, $122,664; account 111, $98,835; part of account 120B, $581; part of account 168, steam plant, $872; part of account 180, $45,200—total for Leadville, $337,598.

The elimination of the Georgetown hydro plant, designated in Exhibit F as "Idaho Springs District," requires the deduction of all the items listed on page 12 of plaintiff's supplemental brief, plus $750 from account 162, Idaho Springs District—a total of $357,088.

The witness, in making this exhibit, for many items necessarily took for granted values that appeared in the so-called Walbridge analysis (Exhibit C), and as to these they are hot the result of his independent judgment. There is no actual testimony as to the present-day value of the property. I arrive at the present-day fair value, or rate base, as follows:

| | | |
|---|---:|---:|
| White valuation as of June 1, 1922, property as of January 1, 1920 | | $11,189,800.00 |
| Less Georgetown and Leadville | | 694,686.00 |
| | | $10,495,114.00 |
| Various deductions from account 109, Shoshone, for excessive costs of dam, headworks, forebay, and other items | $ 476,832.00 | |
| From account 105, Boulder, lands and rights of way | 23,200.00 | |
| From administrative and head office and local engineering superintendence, account 180, Shoshone, p. 80 | 60,900.00 | |
| From same items, account 180, Boulder district, p. 139 | 49,820.00 | |
| Same account, "transmission district" | 8,730.00 | |
| Miscellaneous items from account 120, "transmission district," total | 56,000.00 | |
| Account 105, "transmission right of way" | 2,024.00 | |
| From account 162, general office, p. 2, cut from $11,143 to $7,500, as many items are unnecessary and overvalued | 3,643.00 | |
| | $ 681,149.00 | 681,149.00 |
| | | $ 9,813,965.00 |
| Net additions to property from January 1, 1920, to June 1, 1922 | | 70,023.00 |
| Property as of June 1, 1922 | | $ 9,883,988.00 |
| Water rights other than those in Exhibit F | $ 500,000.00 | |
| Secondary storage | 47,508.00 | |
| Organization expenses (preliminary investigations covered under other items in Exhibit F.) | 25,000.00 | |
| | $ 572,508.00 | 572,508.00 |
| | | $10,456,496.00 |
| Interest during construction | $1,573,475.25 | |
| Going value | 300,000.00 | |
| Working capital | 225,000.00 | |
| | $2,098,475.25 | 2,098,475.25 |
| | | $12,554,971.25 |
| Deduct accrued depreciation on depreciable items, 25.6 per cent | | 2,941,645.31 |
| Rate base | | $ 9,613,325.94 |

On which it is entitled to an 8 per cent. net return.

A difficult question is presented in this case by the so-called "special contracts." It appears that 80 per cent. (figured in K. W.

hours) of the output of the plaintiff company is delivered to consumers holding individual contracts. Three of these consumers, to wit, the Denver Gas & Electric Light Company, the Denver Tramway Company, and the Western Light & Power Company, take over 60 per cent. of the output, of which the Denver Gas Company takes 50 per cent. of the total. Figured in terms of service or firm commitment, these percentages are somewhat less, but still constitute a large proportion of the total. The plaintiff asked the Public Utilities Commission to raise these contract rates 20 per cent., and its other or schedule rates 40 per cent. This the commission refused to do. The bill here prays an injunction restraining the commission, its agents, and the plaintiff's customers from interfering with the plaintiff in demanding and collecting the proposed increased rates. Complaint, Exhibit B.

Many of these contracts were made before the Public Utilities Commission was created. They are not uniform in respect to rates or any other characteristics. They were made, generally speaking, to meet the peculiar requirements of service of each customer, and the rates were fixed to enable the company to get the business. Low rates were necessary to persuade prospective customers to replace steam power with electrical energy. It is evident that the company realizes little, if any, profit from them. The chief consideration for the rates given the three public utilities was what they could make electricity for from coal, and not what it cost the plaintiff, plus a profit.

In addition, these contracts in most instances are more than a mere agreement for a rate. Many required the customer to install certain electrical apparatus, and it is evident that the loss the customers sustained in junking their steam power plants, and making other changes necessitated by the use of electrical energy, was a consideration, and that the latter made these expenditures in reliance on a long-time contract at a low rate. In other words, these customers have in many cases expended money which is now an executed consideration, and cannot be returned if the company is allowed to charge them more than they agreed to pay.

It is also demonstrated that the plaintiff's plant was built on the theory that its product would all be sold in the mining communities, where the cost of producing power, due to high prices of coal and other expense factors, justified a higher rate than as if the product were to be sold in a cheap market, like Denver. It became evident, however, before the plant was fully completed, that this mining market was not sufficient. The plaintiff, therefore, entered into the wholesale contracts with the Denver Gas & Electric Light Company and the two other public utilities mentioned, in order to dispose of a considerable part of its product that otherwise would go to waste. The rates under these contracts are unremunerative. The gas company contract is so worded that, if the plaintiff finds a better or more profitable market for its product, it can, on notice, stop delivery and dispose of it elsewhere. This contract (dated 1911) also recites that the gas company will and it has since paid to the plaintiff the lump sum of $500,000, in addition to the prescribed rates. Further, plaintiff company agreed to make the gas company its exclusive selling agency for the term of

295 F.—13

the contract, to wit, 20 years from 1911, in the city and county of Denver, and Arapahoe and Jefferson counties, and not to sell to others in that territory, with the exception of the Denver Tramway Company. The plaintiff has never exercised its option to cut down to any appreciable degree the amount of energy supplied to the gas company. As a result the latter has been and is by far its largest consumer. It takes the current at any time it desires it, irrespective of the peak load or other demands on the plant. For these reasons it is more than a rate agreement.

It also contains a clause that on certain specified dates, to wit, every five years up to 1924, on demand of either party, the rate to be paid for energy shall be readjusted, and that, if the parties cannot agree, the rate shall be fixed by arbitrators, who "shall take into account a fair business arrangement based upon conditions as they then exist, and without regard to the initial rate hereinbefore specified." It would seem from this that the parties contemplated that changed conditions might justify or require a change in rate, and provided a speedy and effective method of so doing. All the parties to these special contracts appeared before the Public Utilities Commission and protested against the proposed increases, but are not parties in this court.

[10] The plaintiff is not a public utility as to the Denver Gas & Electric Light Company, the Tramway Company, and the Western Light & Power Company, as their contracts do not necessarily affect the general public. Napa Valley Electric Co. v. Railroad Comm. of California, 251 U. S. 366, 40 Sup. Ct. 174, 64 L. Ed. 310. These agreements have been for many years, and are to-day being, performed, and it is conceded that the parties had full power and capacity to contract. Therefore, if these customers are required by this court to pay more than the agreed price, it must be because they are affected by a public interest that subjects them to the police power of the state, and not because the plaintiff is entitled to be released from a hard bargain.

It is undoubtedly true that the state may, in the exercise of its police power, set aside and render invalid a binding contract between a public service company and one of its consumers, and compel the latter to pay a rate higher than that fixed in the contract. Union Dry Goods Co. v. Georgia P. S. Corp., 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420. But in the instant case the state has refused to exercise this power at the request of the plaintiff, and has said after a full hearing that the public interest is not concerned with, or not affected by, these agreements. It has left them where they voluntarily placed themselves. The plaintiff, therefore, asks this court, in effect, to exercise a power undoubtedly vested in the state, and raise rates, after the state rightly or wrongly has refused to.

[11] In Southern Iowa Elec. Co. v. Chariton, 255 U. S. 539, 542, 41 Sup. Ct. 400, 65 L. Ed. 764, the Supreme Court said that, where the public service corporation and the governmental agency dealing with it have power to contract as to rates, and do fix a contract rate for a particular time, the enforcement of the rate is controlled by the obligation resulting from the contract, and the question of whether the rate is so low as to be confiscatory is immaterial.

In Arkansas Gas Co. v. Railroad Comm., 261 U. S. 379, 43 Sup. Ct. 387, 67 L. Ed. 705, the court discussed the question of whether a public utility commission is under a duty to change rates admittedly grossly inadequate, in spite of a binding contract. The court, after quoting with approval the Chariton Case, supra, said (261 U. S. 382, 43 Sup. Ct. 388, 67 L. Ed. 705):

"The question whether, in the absence of the statute—it being made to appear that the stipulated consideration was grossly inadequate—the commission, under the circumstances disclosed by the record, would have been under a duty to fix gate rates in contravention of the contracts, may be put aside with brief consideration. While a state may exercise its legislative power to regulate public utilities and fix rates, notwithstandng the effect may be to modify or abrogate private contracts, * * * there is, quite clearly, no principle which imposes an obligation to do so merely to relieve a contracting party from the burdens of an improvident undertaking. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed, the exertion of legislative power solely to that end is precluded by the contract impairment clause of the Constitution. The power does not exist per se. It is the intervention of the public interest which justifies and at the same time conditions its exercise."

In Paducah v. Paducah Ry., 261 U. S. 267, 273, 43 Sup. Ct. 335, 67 L. Ed. 647, this doctrine is reiterated, the court saying that, where the rate is fixed by a binding contract, the public utility cannot complain, and the question of whether the rate is too low to give a reasonable return is immaterial.

In Columbus Ry. & Power Co. v. Columbus, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648, a rate case, the court says:

"It certainly was not intended to question the principle, frequently declared in decisions of this court, that if a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party: Unforeseen difficulties will not excuse performance."

And (249 U. S. 414, 39 Sup. Ct. 354, 63 L. Ed. 669, 6 A. L. R. 1648):

"It may be, and, taking the allegations of the bill to be true, it undoubtedly is, a case of a hard bargain. But equity does not relieve from hard bargains simply because they are such."

See, also, Muscatine Lighting Co. v. City of Muscatine (D. C.) 256 Fed. 929, and Berg v. Erickson, 234 Fed. 817, 148 C. C. A. 415, L. R. A. 1917A, 648.

If the state, after the hearing, had said that the public interest required them to be raised, this court could not interfere in behalf of the consumer. But the state here has said that they do not affect the public. Under the authorities cited, these are binding contracts, and are not affected by the Public Utilities Act, until some affirmative action thereunder is taken. They have been recognized and performed at all times by the parties. Therefore the question of confiscation is immaterial.

The relief asked for, if granted, would compel the consumer to pay more than his contract called for, without giving him anything in exchange, and deprive him of valuable contract rights without a day in

court. If these particular rates are unprofitable to the power company, it is the result of their voluntary act, and not that of the defendants. There is no evidence in the record to show whether its failure to earn a proper return is the result of the contract rates, the schedule rates, or what rates are necessary to enable it so to do. In fact, the power company contends, and introduced evidence to show, that there was not much difference in the net result between the contract rates and the schedule rates. But this is disputed.

Further, there is no evidence to show how much of a raise is necessary, or what the return would be, if the court granted the relief prayed for, to wit, an increase of 40 per cent. in schedule rates and 20 per cent. in the contract rates. The court cannot aid the power company in obtaining these increases without saying, in effect, that the resultant rate is a fair one, that it was entitled to it, and that the proportionate increases were fair as between the consumers and are what they should pay. To do this would be to function as a rate-making body—a power not vested in federal courts. Newton v. Consolidated Gas Co., 258 U. S. 165, 42 Sup. Ct. 264, 66 L. Ed. 538; City of Minneapolis v. Rand (C. C. A.) 285 Fed. at page 821.

The novelty and complexity of many questions raised in this record justify, I hope, the length of this opinion, and may aid in a final determination. The court has had the advantage of unusual diligence and ability on the part of counsel, except that defendants' counsel have declined to aid the court on the question of valuation.

[12] If my conclusions are correct, the valuation of plaintiff's plant as fixed by the defendant commission is less than half what it should be. This is due chiefly to its failure to allow the power company any value whatever on a very important part of its so-called central system devoted to the public use, notwithstanding its finding that the whole of the central system is necessary to properly serve all its customers, including the three public utilities, who, the commission also say, are taking to a very large extent power capable of firm commitment. This valuation vitally affects all the other conclusions of the commission.

It is not necessary to discuss the evidence on the question of income, except to say that the return found by the commission and that shown by the evidence are wholly inadequate to give the power company a fair return on a proper valuation. Further, the commission's method of valuation, as disclosed by Exhibit K, is in some respects in conflict with the requirements of the Supreme Court. The commission states, and I think correctly, that it has jurisdiction to determine the many questions raised by the record, such as the effect of dump power, contract rates, etc.; but it has not done so. It would seem that they should determine these matters and their effect in more detail before any validity can be given to their orders. Wichita v. Public Utility Comm. of Kansas, 260 U. S. 48, 43 Sup. Ct. 51, 67 L. Ed. 124 (construing a statute similar to the Colorado statute).

A long time—over four years—has elapsed since the plaintiff first sought relief, and it has been diligent in putting the matter before the commission and court. As far as it can be determined now, it has been subjected to an irreparable confiscation during all this time, and

should not be compelled to suffer further loss. It is therefore entitled to an injunction that will protect it against the enforcement of any rate that will deprive it of a fair return upon the rate base here announced, provided, however, that the rights of customers under contracts in'force are not impaired. If it is determined in a proper proceeding to what extent, if any, these contracts, when viewed in the light of all the surrounding conditions, affect or prevent the power company from obtaining a fair return on the present-day fair value of its plant devoted to the public use, it may be necessary or proper to modify or vacate this injunction. If, so, application may be made.

An injunction will be issued in accordance with these views.